# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES,

       Plaintiff,

vs.                                         No. CR 14-0922 JB-1

JASONN GONZALES,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Jasonn Gonzales' Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act, filed May 18, 2020 (Doc. 136)("Motion"). The Court held a hearing on the Motion on July 20, 2020. See Clerk's Minutes at 1, filed September 23, 2020 (Doc. 148). The primary issues are: (i) whether Defendant Jasonn Gonzales has exhausted his administrative remedies, where Gonzales filed an Inmate Request for compassionate release and the Warden, D. Easter, denied his request; (ii) whether extraordinary and compelling circumstances warrant reduction in Gonzales' sentence under the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A)("First Step Act"), where the Bureau of Prisons ("BOP") has done a poor job of managing Gonzales' health problems, by delaying care, or, with respect to some health problems, neglecting Gonzales' issues entirely; (iii) whether a sentence reduction is consistent with applicable policy statements issued by the United States Sentencing Commission ("Commission"); and (iv) whether a sentence reduction is consistent with the 18 U.S.C. § 3553(a) factors. The Court concludes that: (i) Gonzales has exhausted his administrative remedies, because the Warden denied Gonzales' request for compassionate release before Gonzales filed the Motion; (ii) Gonzales' case does not present extraordinary and compelling circumstances, because, (a) although the BOP has not managed well Gonzales' health problems,

the BOP is capable of doing so; and (b) the Court finds, by a preponderance of the evidence, that Gonzales would not receive better care at his home in rural Abiquiu, New Mexico, than the Federal Correctional Institute Danbury ("FCI Danbury"), a level three medical care facility, can provide; (iii) the Sentencing Commission has no applicable policy statements upon which the Court may rely, pursuant to the United States Court of Appeals Tenth Circuit's holding in <u>United States v. McGee</u>, 992 F.3d 1035 (10th Cir. 2021)("<u>McGee</u>")); and (iv) the § 3553(a) factors do not support Gonzales' release, because a time-served sentence is not sufficient to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from Gonzales, nor to provide Gonzales with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Accordingly, the Court denies the Motion, but recommends and requests that the United States file a written report with the Court on July 1, 2021, informing the Court and the parties of Gonzales' condition and whether the BOP is providing Gonzales with appropriate medical care.

## **FACTUAL BACKGROUND**

The Court takes its facts from: (i) its Memorandum Opinion and Order, <u>United States v. Gonzales</u>, 163 F. Supp. 3d 1078, 1081-82 (D.N.M. 2016)(Browning, J.), filed February 16, 2016 (Doc. 90)("MOO"), <u>aff'd</u>, 844 F.3d 929 (10th Cir. 2016); (ii) the Motion; (iii) Jasonn Gonzales Reply Re Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act, filed June 16, 2020 (Doc. 141)("Reply"); (iv) the Post-Conviction Memorandum: Compassionate Release Investigation, filed July 15, 2020 (Doc. 145)("Post-Conviction Memo."); (v) Jasonn Gonzales' Post-Hearing Brief, filed July 21, 2020 (Doc. 146)("Brief"); (vi) Jasonn Gonzales' Second Sealed Supplement to Motion for Compassionate Release Pursuant to Section 603(B)(1)

of the First Step Act, filed September 18, 2020 (Doc. 147)("Second Supp."); (vii) Jasonn Gonzales' Third Supplement to Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act, filed September 30, 2020 (Doc. 149)("Third Supp."); (viii) Jasonn Gonzales' Fourth Supplement to Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act, filed November 4, 2020 (Doc. 150)("Fourth Supp."); (ix) Jasonn Gonzales' Sealed Sixth Supplement to Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act at 1, filed December 17, 2020 (Doc. 152)("Sixth Supp."); and (x) Jasonn Gonzales' Seventh Supplement to Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act at 1, filed March 4, 2021 (Doc. 154)("Seventh Supp."). The Court first describes Gonzales' previous criminal history. Second, the Court discusses Gonzales' offense of conviction. Third, the Court describes Gonzales' time in prison, including his medical problems and his rehabilitative efforts. Last, the Court discusses COVID-19 in prisons generally and at FCI Danbury.

1.      **Gonzales' Criminal History**.

1.      "Gonzales has two prior criminal convictions": one for indecent exposure, and one conviction for attempted rape and attempted burglary. MOO, 163 F. Supp. at 1082 (citing Presentence Report ¶¶ 80-81, at 22, filed June 1, 2021 (Doc. 159)("PSR")).

2.      "[O]n August 16, 1988, and August 22, 1995," Gonzales "'did willfully, unlawfully, and lewdly expose his private parts in a public place where other people were present, offended, and annoyed . . . . Four counts for Lewd Conduct and one count of Indecent Exposure were dismissed.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 80, at 22).

3.      "'At the time of the referral, on August 16, 1988, Gonzales was sixteen years old.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 80, at 22).

4.      "'[O]n December 13, 1988, Gonzales was sentenced to an unknown term of probation for indecent exposure in the Superior Court of California -- Juvenile Court, Los Angeles.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 80, at 22).

5.      "'[O]n March 9, 1991, when Gonzales was eighteen years old, he was arrested in Utah and charged with: (i) one count of attempted rape; (ii) one count of attempted sodomy/forcible sodomy; and (iii) one count of attempted burglary of a dwelling.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 81, at 22).

6.      "'[O]n February 10, 1991, the defendant had sexual intercourse with another who was not his spouse and without her consent.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 81, at 22).

7.      "'The offense was committed during the course of a burglary, where he caused physical injury to another while attempting to flee.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 81, at 22).

8.      "[O]n May 3, 1991, Gonzales was sentenced to fifteen years as to count one, and as to count three, not more than five years, all to run concurrently." MOO, 163 F. Supp. at 1082 (citing PSR ¶ 81, at 22).

9.      Gonzales "'was released to parole supervision on March 12, 2002.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 81, at 22).

10.      Gonzales "'had no violations while on parole and successfully completed Sex Offender Treatment as required.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 81, at 22).

11.      Gonzales "'is required to register as a sex offender annually, for life.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 81, at 22).

12.      He "'first registered in the state of New Mexico in 2003.'" MOO, 163 F. Supp. at

1082 (quoting PSR ¶ 81, at 22).

13.     Additionally, "Gonzales was issued citations for speeding on August 8, 2006, January 2, 2013, and September 25, 2013." MOO, 163 F. Supp. at 1082 (citing PSR ¶ 84, at 23).

14.     "Gonzales was convicted in two of these matters and received a deferred sentence and fees." MOO, 163 F. Supp. at 1082 (citing PSR ¶ 84, at 23).

15.     "The remaining case was dismissed." MOO, 163 F. Supp. at 1082 (citing PSR ¶ 84, at 23).

16.     "On January 31, 2007, when Gonzales was thirty-four years old, he was arrested and charged for 'Patronizing Prostitutes' in Bernalillo County Metropolitan Court in Albuquerque, New Mexico." MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 87, at 23).

17.     "On June 26, 2007, the case was dismissed." MOO, 163 F. Supp. at 1082 (citing PSR ¶ 87, at 23).

18.     "'Officers made contact with' Gonzales, '"who admitted he agreed to pay . . . $30.00 for fellatio.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 87, at 23).

19.     "'On April 30, 2011, when Gonzales was thirty-eight years old, he was arrested for 'Registration of Sex Offenders Information Required.'" MOO, 163 F. Supp. at 1082 (quoting PSR ¶ 88, at 24.

20.     "'On March 26, 2014, the case was dismissed.'" MOO, 163 F. Supp. at 1083 (quoting PSR ¶ 88, at 24).

**2.      The Underlying Offense.**

21.     "From January 2009 to May 2012, Gonzales and co-Defendant Gerald Archuleta, along with other unindicted individuals, took part in a conspiracy to devise a scheme to defraud and obtain money, specifically unemployment insurance benefits, from the Texas Workforce

Commission [("TWC")], Colorado Department of Labor and Employment [("CDLE")], and New Mexico Department of Workforce Solutions [("NMDWS")] by means of materially false and fraudulent pretenses and representations and, for the purpose of executing the scheme and artifice, did knowingly cause the United States Postal Service and commercial interstate carrier to move and deliver envelopes containing debit cards by which benefits were paid." MOO, 163 F. Supp. at 1081 (citing PSR ¶ 5, at 4).

22.     "To carry out their scheme, Gonzales and Archuleta fraudulently obtained 'names, social security numbers, and dates of birth of individuals without such individuals' knowledge.'" MOO, 163 F. Supp. at 1081 (quoting PSR ¶ 6, at 5).

23.     "Further, 'the defendants provided TWC, CDLE, and NMDWS with false and fictitious quarterly reports listing non-existent companies that reflected the names of individual identities as the employees of the fictitious companies.'" MOO, 163 F. Supp. at 1081 (quoting PSR ¶ 6, at 5.

24.     "'The defendants would then apply for UI benefits under such individuals' identities without their knowledge or authority and provide TWC, CDLE, and NMDWS with the names of false and fictitious last employing units ('LEUs') and LEU addresses that they controlled.'" MOO, 163 F. Supp. at 1081 (quoting PSR ¶ 6, at 5).

25.     "To provide fictitious LEU addresses, Gonzales and Archuleta traveled across state lines for the purpose of opening various post office boxes to use in their scheme." MOO, 163 F. Supp. at 1081 (citing PSR ¶ 6, at 5).

26.     "Once these post office boxes were opened," Gonzales and Archuleta "reported the fictitious address to receive debit cards containing unemployment insurance benefits to be sent via the United States Postal Service and private commercial interstate carrier." MOO, 163

F. Supp. at 1081 (citing PSR ¶ 6, at 5).

27.    "Upon receipt of these debit cards, Gonzales and Archuleta used the debit cards for their own personal use and benefit."  MOO, 163 F. Supp. at 1081 (citing PSR ¶ 6, at 5).

28.    "The investigation revealed that the defendants opened sixty-one postal office boxes throughout Texas, Colorado, and New Mexico."  MOO, 163 F. Supp. at 1081 (citing PSR ¶ 6, at 5).

29.    "The scheme fraudulently used approximately 107 victim identities and was connected to twenty fictitious companies -- eleven in New Mexico, seven in Colorado, and two in Texas."  MOO, 163 F. Supp. at 1081 (citing PSR ¶ 7, at 5).

30.    "The scheme resulted in a total loss of $804,735.73."  MOO, 163 F. Supp. 3d at 1081-82 (citing PSR ¶ 7, at 5).

31.    From April 2020 to April 2021, unemployment fraud schemes in New Mexico resulted in $133,000,000.00 in losses.  Unemployment Insurance at 10, Legislative Finance Committee (May 19, 2021) https://www.nmlegis.gov/Entity/LFC/Documents/Program_Evaluation_Reports/Spotlight%20-%20Unemployment%20Insurance%20System.pdf ("LFC Report").

32.    "Since 2018, New Mexico's rates of improper payments and fraud have more than doubled."  See LFC Report at 10.

33.    In the United States, during the COVID-19 pandemic, billions in unemployment relief funds were stolen by persons who fraudulently applied for pandemic-related unemployment benefits.  See, e.g., Scott Zamost, Secret Service Seizes $2 Billion in Fraudulent Covid Unemployment Payments, Returns Funds to States, CNBC (May 21, 2021), https://www.cnbc.com/2021/05/12/secret-service-seizes-2-billion-in-fraudulent-unemployment-

payments-returns-funds-to-states.html.

### 3.      Gonzales' Education and Employment.

34.      "Gonzales attended Agora High School, until he was expelled for truancy, at which point he began attending Indian Hills High School, both in Calabasas, California."  MOO, 163 F. Supp. 3d at 1081-82 (citing PSR ¶ 101, at 28).

35.      "He attended Indian Hills High School from February 21, 1989, through May 2, 1989."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 101, at 28).

36.      "He was then sent to Provo Canyon Charter High School in Utah, where he remained through December 20, 1990."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 101, at 28).

37.      "After submitting documentation to verify his completion of classes at Provo Canyon Charter High School, Gonzales received his high school diploma from Indian Hills High School on June 20, 1991."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 101, at 28).

38.      "Then, while Gonzales was incarcerated, he attended Utah State University from September 1992 through June 2001, where he earned a bachelor's degree in Accounting."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 101, at 28).

39.      "Gonzales is fluent in English and understands some Spanish."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 101, at 28).

40.      "From 2002 to 2005, Gonzales worked as an accountant at Shidoni Bronze in Tesuque, New Mexico, but resigned from his position when he secured new employment."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 108, at 29).

41.      "From April 24, 2006, to August 4, 2006, Gonzales was employed as a staff accountant at Akal Security in Santa Cruz, New Mexico, but resigned for unknown reasons."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 107, at 29).

42.     "Gonzales was then employed as a bookkeeper in 2006 at Conservation Solutions, Inc. in Santa Fe, New Mexico, but was laid off because the position was temporary."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 106, at 29).

43.     "From 2007 to 2008, Gonzales was employed as a scheduler and accountant at J & P Plumbing in Santa Fe."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 105, at 29).

44.     "Gonzales was laid off from this position because of lack of a business."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶ 105, at 29).

45.     "Subsequently, between August 4, 2008, and September 25, 2009, Gonzales worked as an accountant at the Ohkay Owingeh Housing Authority in Ohkay Owingeh, New Mexico, but he was 'terminated for falsifying his application by failing to disclose his prior felony conviction.'"  MOO, 163 F. Supp. 3d at 1086 (quoting PSR ¶ 104, at 29).

46.     "Since January, 2014, Gonzales' mother has employed him at the Purple Adobe Lavender Farm."  MOO, 163 F. Supp. 3d at 1086 (citing PSR ¶¶ 102-103, at 28).

47.     Gonzales "'has been working with his mother intermittently since 2004, but this has been his primary employment since January 2014.'"  MOO, 163 F. Supp. 3d at 1086 (quoting PSR ¶ 103, at 28).

48.     Gonzales assisted "'his mother with her business, which includes a lavender farm, tearoom, and gift shop.'"  MOO, 163 F. Supp. 3d at 1086 (quoting  PSR ¶ 103, at 28).

49.     "'He complete[d] any tasks that require his assistance and also helps with accounting.'"  MOO, 163 F. Supp. 3d at 1086 (quoting  PSR ¶ 103, at 28).

50.     "'He [wa]s paid in trade for all of his living expenses.'"  MOO, 163 F. Supp. 3d at 1086 (quoting  PSR ¶ 103, at 28).

4.    **Gonzales' Post-Offense, Pre-Incarceration Conduct**.

51.    Gonzales committed no additional crimes "in the roughly two years between the search warrant was served and prosecution commenced."  Reply at 3.

52.    Thereafter, Gonzales "complied with pre-trial services during the 26 months between indictment and voluntary surrender."  Reply at 3.

53.    Gonzales also surrendered voluntarily himself "to FCI Big Springs as ordered."  Reply at 5.

5.    **Gonzales' Time in Prison**.

54.    Gonzales' health has declined since entering prison.  See Motion at 3.

55.    During his time at FCI Danbury, Gonzales has been hospitalized repeatedly for COVID-19 and for other health conditions.  See Motion at 3.

56.    Gonzales has been involved in rehabilitative efforts in prison, including teaching a GED class.  See Motion at 28; Reply at 3

a.    **Gonzales' Health Problems**.

57.    When Gonzales began his sentence, he "suffered from asthma and morbid obesity."  Motion at 3.  See Letter from Roger and Pamela Inman to Warden of Danbury Facility at 31 (dated April 16, 2020), filed May 18, 2020 (Doc. 136)(asserting that Gonzales "has had severe asthma since he was a child").

58.    "Since going to prison, his health has significantly worsened."  Motion at 3.

59.    Gonzales has also been diagnosed with "deep vein thrombosis,[1]" peripheral

---

[1]"Deep vein thrombosis (DVT), a blood clot in the deep veins usually of the leg, can cause painful swelling.  It is also an extremely dangerous condition, as 'blood clots in [the] veins can break loose, travel through [the] bloodstream and lodge in [the] lungs, blocking blood flow (pulmonary embolism).'"    Motion at 3 (quoting Deep Vein Thrombosis, Mayo Clinic https://www.mayoclinic.org/diseasesconditions/deep-vein-thrombosis/symptoms-causes/syc-203

vascular disease,[2] "cellulitis,[3] leukocytosis (abnormally high white blood count which can indicate a bone marrow disease or an immune system disorder), and obstructive sleep apnea.[4]" Motion at 3. See Sixth Supp. at 7; July 1 Clinical Notes at 10 (stating that Gonzales "has history [sic] chronic PVD that has been complicated by DVT/Phlebitis"); July 20 Clinical Notes at 4-5 (listing Gonzales' current conditions as asthma, cellulitis, obesity, and sleep apnea).

60.     The current list of conditions that may make an individual "more likely to get severely ill from COVID-19" include: (i) cancer; (ii) chronic kidney disease; (iii) chronic obstructive pulmonary disease; (iv) moderate and severe asthma; (v) interstitial lung disease; (vi) cystic fibrosis; (vii) pulmonary hypertension; (viii) dementia; (ix) down syndrome; (x) heart

---

52557 (last visited April 2, 2021))(alterations in Motion).

[2]Peripheral vascular disease is

a slow and progressive circulation disorder. Narrowing, blockage, or spasms in a blood vessel can cause PVD.

PVD may affect any blood vessel outside of the heart including the arteries, veins, or lymphatic vessels.  Organs supplied by these vessels, such as the brain, and legs, may not get enough blood flow for proper function. However, the legs and feet are most commonly affected.

Peripheral Vascular Disease, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/peripheral-vascular-disease (last visited April 8, 2021).

[3]"Cellulitis is an infection of the skin that can also be dangerous. 'Left untreated, the infection can spread to [the] lymph nodes and bloodstream and rapidly become life threatening.'" Motion at 3 (quoting Cellulitis, Mayo Clinic, https://www.mayoclinic.org/diseasesconditions/cellulitis/symptoms-causes/syc-20370762 (last visited April 6, 2021))(alterations in Motion only).

[4]Obstructive sleep apnea is "a potentially serious sleep disorder.  It causes breathing to repeatedly stop and start during sleep. . . .  This type of apnea occurs when your throat muscles intermittently relax and block your airway during sleep.  A noticeable sign of obstructive sleep apnea is snoring." Obstructive Sleep Apnea, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/symptoms-causes/syc-20352090 (last visited April 6, 2021).

conditions, including heart failure, coronary artery disease, cardiomyopathies or hypertension; (xi) human immunodeficiency virus ("HIV"); (xii) immunocompromised state; (xiii) being overweight, obese, or severely obese; (xiv) pregnancy; (xv) hemoglobin blood disorders; (xvi) being a current or former cigarette smoker; (xvii) "[h]aving had a solid organ or blood stem cell transplant, which includes bone marrow transplants"; (xviii) stroke or cerebrovascular disease; (xix) diabetes; and (xx) substance use disorders. People with Certain Medical Conditions, CDC (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#MedicalConditionsAdults [https://perma.cc/B5AE-QE3W].

61.     As a result of the sleep apnea, Gonzales "requires a CPAP (continuous positive air pressure) device[5] to assist his breathing at night." Motion at 6.

62.     Gonzales is six feet tall and weighs approximately 440 pounds. See Brief at 12.

63.     Gonzales has a Body Mass Index ("BMI") of 59.5. See Brief at 12.

64.     Since 2016, Gonzales has been hospitalized several times "for cellulitis that turned into sepsis[6] or near-sepsis." Motion at 4.

---

[5]"Continuous positive airway pressure (CPAP) therapy is a common treatment for obstructive sleep apnea. A CPAP machine uses a hose and mask or nosepiece to deliver constant and steady air pressure." CPAP Machines, Mayo Clinic (May 17, 2018), https://www.mayoclinic.org/diseases-conditions/sleep-apnea/in-depth/cpap/art-20044164.

[6]Sepsis is

the body's extreme response to an infection. It is a life-threatening medical emergency. Sepsis happens when an infection you already have triggers a chain reaction throughout your body. Without timely treatment, sepsis can rapidly lead to tissue damage, organ failure, and death.

Almost any type of infection can lead to sepsis. Infections that lead to sepsis most often start in the lung, urinary tract, skin, or gastrointestinal tract.

. . . .

65.     On September 21, 2018, Gonzales was admitted to the emergency room.  See Patient History and Physical at 37 (dated Sept. 21, 2018), filed May 18, 2020 (Doc. 137)("Sept. 21 Patient History").

66.     Gonzales "ended up in the hospital because a leg infection was ignored until he became septic and almost died."  Reply at 6.

67.     Gonzales had "a chronically recurring left shin wound which keeps opening up and resulting in cellulitis."  Sept. 21 Patient History at 37.

68.     Gonzales was experiencing left calf pain and a left shin wound.  See Sept. 21 Patient History at 37.

69.     Gonzales' skin was red and tender, which the physician noted "is concerning for cellulitis."  Sept. 21 Patient History at 40.

70.     Gonzales was diagnosed with cellulitis of the left leg, which resulted in sepsis and necessitated an intravenous antibiotic drip.  See Sept. 21 Patient History at 41.

71.     Gonzales was discharged from the hospital on September 26, 2018.  See Sept. 21 Patient History at 41.

72.     In 2019, Gonzales "was suffering an asthma attack, but was out of the liquid albuterol[7] he needed for a nebulizer treatment."  Brief at 17.

---

When germs get into a person's body, they can cause an infection. If you don't stop that infection, it can cause sepsis.

Sepsis, Centers for Disease Control and Prevention (Jan. 27, 2021), https://www.cdc.gov/sepsis/what-is-sepsis.html.

[7]"Albuterol sulphate dilates the airways of the lung and is used for treating asthma and other conditions of the lung."  Omudhome Ogbru and Jay W. Marks, Albuterol (Ventolin, Proventil), MedicineNet (Aug. 1, 2019), https://www.medicinenet.com/albuterol/article.htm#what_is_albuterol_and_how_does_it_work_mechanism_of_action

73.     "The nurse told him to wait until she finished the pill line."  Brief at 17.

74.     "About an hour and a half later, he asked for the nurse, and was told to wait until called."  Brief at 17.

75.     "An hour and a half later, he asked again and was told that she had left the facility," without providing Gonzales "with the necessary medication."  Brief at 17.

76.     On March 1, 2020, Gonzales presented again at the emergency room with "worsening leg pain."  ED Physician Note at 2 (dated March 1, 2020), filed May 18, 2020 (Doc. 137).

77.     Gonzales was also hospitalized for COVID-19, once in March, 2020, and once April, 2020.  See Motion at 21.

78.     On March 31, 2020, Gonzales was admitted to the Danbury Hospital, because he had contracted COVID-19.  See Danbury Hospital History & Physical at 8 (dated March 31, 2020), filed May 18, 2020 (Doc. 137)("March 31 Hospital Records").

79.     Gonzales' symptoms had worsened and he had been coughing up blood.  See March 31 Hospital Records at 8.

80.     The COVID-19 infection exacerbated Gonzales' existing asthma.  See March 31 Hospital Records at 9; id. at 15 (stating that Gonzales "presented with exacerbation of reactive airway disease in the setting of symptoms concerning for viral infection").

81.     The hospital discharged Gonzales on April 2, 2020.  See ED Physician Note at 24 (dated April 4, 2020), filed May 18, 2020 (Doc. 137)("April 4 ED Note").

82.     The hospital readmitted Gonzales on April 4, 2020.  See April 4 ED Note at 24.

83.     Gonzales felt short of breath and a severe burning pain in his lungs "whenever he t[ook] a deep breath."   April 4 ED Note at 24.

84. "When he was discharged from the hospital for the second time when he had the Covid-19, his symptomatic relief azithromycin[8] was not even ordered until ten days after his second discharge for coronavirus treatment, and presumably started a few days after that."  Brief at 15.  See Reply at 7 ("When he went to the hospital for a second time due to coronavirus respiratory distress, the hospital made it clear that he needed a Z-pack for relief of these symptoms, but Danbury took two weeks to get around to filling that prescription.").

85. Gonzales "was very ill and could not breathe and had to administer to himself many nebulizer treatments . . . .  This put a strain on his heart . . . ."  Letter at 35.

86. On a June 1, 2020, visit with health care providers, Gonzales reported that "[h]e fell a while ago and is now having constant pain for the last 4 months."  June 1 Clinical Notes at 2.

87. Gonzales noted that his pain level was at a nine out of ten.  See June 1 Clinical Notes at 2.

---

[8]Azithromycin

alone and in combination with other medications is currently being studied for the treatment of coronavirus disease 2019 (COVID-19).

. . . .

Azithromycin is used to treat certain bacterial infections, such as bronchitis; pneumonia; sexually transmitted diseases (STD); and infections of the ears, lungs, sinuses, skin, throat, and reproductive organs. Azithromycin also is used to treat or prevent disseminated *Mycobacterium avium* complex (MAC) infection [a type of lung infection that often affects people with human immunodeficiency virus (HIV)]. Azithromycin is in a class of medications called macrolide antibiotics. It works by stopping the growth of bacteria.

Azithromycin, Medline Plus (last revised April 15, 2020), https://medlineplus.gov/druginfo/meds/a697037.html.

88.     In July, 2020, Gonzales again became infected with cellulitis.  See Brief at 1-2.

89.     Gonzales experienced "yet another leg infection . . . requiring antibiotic treatment, rash and bruising possibly related to COVID-19, and with knee pain for the last four months, unrelieved by over the counter medications."  Second Supp. at 1.  See Bureau of Prisons Health Services Clinical Encounter at 4 (dated August 19, 2020), filed September 18, 2020 (Doc. 147)(stating that Gonzales "was seen by a paramedic on 7-20-20 due to an infection in his leg")("Aug. 19 Clinical Notes").

90.     On a July 1, 2020, visit, Gonzales "report[ed] that bilateral legs are bothering him and throbbing."  July 18 Clinical Notes at 10.

91.     On July 18, 2020, Gonzales informed staff that "my legs are throbbing, almost like a pressure-type pain or something."  Bureau of Prisons Health Services Clinical Encounter at 8-97 (dated July 18, 2020), filed September 18, 2020 (Doc. 147)("July 18 Clinical Notes").

92.     "Swelling" and " a small wound" were also present.  July 18 Clinical Notes at 9.

93.     Additionally, Gonzales had a "rash noted on his left chest area."  July 18 Clinical Notes at 13.

94.     Emergency Medical Technicians ("EMTs") then visited Gonzales on July 20, 2020, in response to his complaint of "right leg pain and redness," which was "painful to the touching [sic] and swollen," although he reported that the pain had begun three to five days before the examination.  Bureau of Prisons Health Services Clinical Encounter at 6-7 (dated July 20, 2020), filed September 18, 2020 (Doc. 147)("July 20 Clinical Notes").

95.     On August 18, 2020, Gonzales' doctor informed him that he had developed "a 'Covid rash' -- micro blood clot bursts in his legs, stomach and arms."  Second Supp. at 2 (no citation for quotation).

96.    "Covid-19 has been linked to an increased risk of stroke, and Mr. Gonzales fears . . . that his mini-bleeds could indicate an increased potential for a stroke."  Second Supp. at 2 (citing Johanna T. Fifi, Large-Vessel Stroke as a Presenting Feature of Covid-19 in the Young, 60 New Eng. J. Med. 382 (2020); Alexander E. Merkler, et al, Risk of Ischemic Stroke in Patients With Coronavirus Disease 2019 (COVID-19) vs. Patients With Influenza, J. Amer. Med. Assoc. Neurology (2020)).

97.    On September 17, 2020, Gonzales reported:

> I have a horrible rash all over my body which the doctor I saw on Aug. 18th told me was a Covid rash, as well as the blood bursts under my skin . . . and every day that goes by I'm getting more and more bruising all over my body.  I have no idea why I'm getting so much bruising everywhere, I have never experienced this before and quite frankly it has me terrified because obviously it had something to do with my blood and considering I have had problems with DVT blood clots in my history, I'm freaked out. . . .  As of now, I have no idea of when let alone if I'll be seen.  I still have pending issues to be seen by a specialist for my hurt knee from the beginning of this year, [which] I'm still suffering pain daily from.

Second Supp. at 2-3.

98.    On September 30, 2020, Gonzales reported:  "As an update to the rash and bruising he has suffered from since July, he has put in multiple sick call requests over the last three weeks and has written to administration, and has neither been seen nor treated for his condition . . . ."  Third Supp. at 1.

99.    The condition "involves rash, bruising, and itching and pain so severe they keep him from sleeping at night."  Third Supp. at 1.

100.    In November, 2020, Gonzales returned "to the Danbury Community Hospital Emergency Department again . . . for respiratory distress."  Sixth Supp. at 1.

101.    As of December 17, 2020, Gonzales continues to "suffer[] from a painful skin condition."  Sixth Supp. at 1.

102.    Gonzales' "skin conditions have progressed so far that they emit a foul smell." Sixth Supp. at 1.

103.    The rash became "much worse and is now covering most of his body -- with open sores that are weeping pus and soaking his clothes."  Sixth Supp. at 7.

104.    Gonzales' "severe rash" remains untreated.  Sixth Supp. at 7.

105.    Gonzales' conditions are relatively common.  See, e.g., S.M. Ellis Simonsen et al., Cellulitis Incidence in a Defined Population, 134 Epidemiology & Infection 293-99 (2006)(explaining that "cellulitis is a commonly occurring infection of the skin and subcutaneous tissues that can lead to life threatening complications"); Jaspal Singh, Basics of Sleep Apnea, American College of Cardiology (Jan, 8, 2013), https://www.acc.org/latest-in-cardiology/articles/2014/07/22/08/25/basics-of-central-sleep-apnea (stating that obstructive sleep apnea is "extremely common in the adult population").

106.    The BOP is capable of treating Gonzales' health conditions, but has left untreated entirely or delayed treatment for many of his health issues.  See Tr. at 26:5-13 (Court, Converse)(agreeing that Gonzales "has received adequate care at the Danbury Hospital"); Sixth Supp. at 7.

**b.    Gonzales' Rehabilitation Efforts in Prison.**

107.    Within the prison, Gonzales has no history of discipline.  See Motion at 28; Reply at 3 (explaining that Gonzales "has served over four years in the BOP without any disciplinary write-ups").

108.    Gonzales has also "engaged in extensive programming" through the BOP.  Motion at 28.  See Reply at 3 (noting that Gonzales "has engaged in extensive rehabilitative and vocational programming").

109. Gonzales has described his efforts in prison, his remorse for his crimes, and his hopes for the future:

> My days are filled with thoughts of the future and what I am going to do to make it the best I possibly can for [my daughter] and myself. Which entails living my life the right way. Making the right decisions. I have no desire to commit crimes again. I want a good life with my family in it and to be successful the right way; something I can be proud of. I know full well how I have let people down with the bad choices I have made in my life. I can't change that; all I can do is prove what I can do and what I will do. I look forward to the day I get to show what I am capable of doing. When things get difficult it means I will just have to work harder. I'm not afraid of that anymore. I'm afraid of failing. And to me being in prison is being a failure. I'm done with that.

Reply at 4 (alteration in original).

110. While incarcerated, Gonzales has maintained close ties with his family. See Reply at 5.

111. Gonzales' daughter has visited him in prison and speaks with him regularly. See Reply at 5.

112. Gonzales asserts that he and his daughter "stay in constant contact" and that he "help[s] her with homework over the phone . . . ." Reply at 5.

113. Gonzales advises that his daughter is "the most important thing in my life and I was an active father before I came to prison and most certainly plan to be there actively when I go home." Reply at 5.

6. **COVID-19 and FCI Danbury**.

114. "Because all low security housing areas at Danbury are dorm facilities, there is no possible way to socially distance." Reply at 9:

115. "There are 100 men per dorm in bunks separated by four feet or less, who share three computers, two phones, two urinals, four toilets, four sinks, and four showers." Reply at 9.

116.    Federal prisoners have contracted COVID-19 more than once.  See Fourth Supp. at 2.

117.    For example, an inmate at FCI Butner in Butner, North Carolina tested positive for COVID-19 in June, 2020, and again in September, 2020.  See Fourth Supp. at 2.

118.    The inmate who had tested positive for COVID-19 twice and "had long-term, pre-existing medical conditions, which the CDC lists as risk factors for developing more severe COVID-19 disease, was pronounced dead by hospital staff" on September 17, 2020.  Fourth Supp. at 2.

119.    FCI Danbury is "a level three care facility," Tr. at 8:12-14 (Converse), which is designed for "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications," Care Level Classification for Medical and Mental Health Conditions or Disabilities at 5, Federal Bureau of Prisons Clinical Guidance (May 2019), https://www.bop.gov/foia/docs/medicalclassificationguidelines.pdf ("Care Level Classification").

120.    Level three care facilities like FCI Danbury are equipped to treat the following "example conditions: cancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, . . . congestive heart failure, and end-stage liver disease." Care Level Classification at 5.

7.    **Gonzales' Remaining Sentence.**

121.    On December 4, 2014, the Court sentenced Gonzales to 111 months in prison.  See MOO, 163 F. Supp. 3d at 1132.

122.    Gonzales began his sentence on May 4, 2016.  See Motion at 2.

123.     Gonzales' projected release date is April 22, 2024.  See Find an Inmate: Jasonn Gonzales, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited May 27, 2021)("Gonzales Inmate Listing").  Cf. Motion at 2 (listing Gonzales' release date as March 12, 2024).

124.     Gonzales therefore has served approximately 61.8% of his sentence.  See Gonzales Inmate Listing.

**8.     Gonzales' Release Plan.**

125.     Upon his release, Gonzales hopes to work in his mother's lavender farm business.  See Reply at 5.

126.     Gonzales "would help wherever he is needed in the company."  Reply at 5.

127.     Specifically, Gonzales' responsibilities would entail: (i) data entry; (ii) shipping, packing, and labeling packages; (iii) office organization; (iv) building a new website; (v) increasing the business' social media presence and sales; and (vi) physical labor on the farm.  See Reply at 6.

128.     The lavender farm "runs through a system where we do not see the customer's personal information . . . ."  Reply at 6.

129.     Relatedly, Gonzales "would not be a signer on any bank accounts . . . ."  Reply at 6.

130.     Gonzales "knows the business well so that he can handle the necessary creative side as well as the technical parts of the company."  Inman Letter at 34 (dated May 16, 2020), filed May 18, 2020 (Doc. 136).

131.     Gonzales hopes to "be a productive member of society . . . to do things the right way and establish myself."  Reply at 13.

132. Gonzales also hopes to assist with raising his daughter. See Reply at 4.

133. Gonzales would reside on the lavender farm with his mother and step-father in Abiquiu, New Mexico. See Post-Conviction Memo. at 1.

134. Gonzales "would have his own room and there is another room available for Jordynn (his daughter) when she comes to visit." Inman Letter at 34.

135. The "proposed residence is suitable for" Gonzales; his mother and step-father are "extremely supportive." Post-Conviction Memo. at 1.

136. Gonzales' proposed residence is approximately twenty-five minutes from Espanola Presbyterian Hospital. See Route from Purple Adobe Lavender Farm to Presbyterian Espanola Hospital, https://www.google.com/maps/dir/Purple+Adobe+Lavender+Farm,+Private+Rd+1622 +Gate,+31,+Abiquiu,+NM+87510/Presbyterian+Espanola+Hospital,+Spruce+Street,+Espa%C3 %B1ola,+NM/@36.1060176,-106.2604485,12z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x871 7f6558db93071:0x7201900b55495529!2m2!1d-106.296254!2d36.2129661!1m5!1m1!1s0x8718 3cf2c7feaf03:0x7cdfb361aa7b206c!2m2!1d-106.0883593!2d35.9972875 (last visited April 8, 2021).

137. The "semi-rural community" near his proposed residence also has a clinic. Inman Letter 35.

138. Gonzales will, when released, "apply for Medicaid and will be able to move forward and buy insurance . . . ." Inman Letter at 35.

## PROCEDURAL BACKGROUND

Gonzales filed the Motion, the United States filed a Response, and Gonzales filed a Reply. The Court held a hearing on the Motion. Gonzales filed the Brief directly after the hearing. Since filing the Motion, Gonzales has filed seven supplements with updates on his medical condition

and the law regarding compassionate release. The Court describes the procedural background related to Gonzales' Motion below.

### 1.    **The Motion.**

In the Motion, Gonzales asks the Court to order his compassionate release from prison, because Gonzales "is a seriously ill individual . . . ." Motion at 1. Gonzales notes that he has served over half of his sentence, and that his projected release date is March 12, 2024. See Motion at 2. He explains that he "has completed over half of his sentence, and thus far has earned full good time." Motion at 2.

#### a.    **Gonzales' Medical Conditions.**

Gonzales identifies each of his medical conditions, and cites cases in which courts have granted compassionate release. See Motion at 2-8. Gonzales notes that in United States v. Manning, No. 15 CR 50007 (N.D. Ill. April 20, 2020)(Kenelly, J.), the United States District Court for the Norther District of Illinois granted compassionate release to a defendant who suffered from deep vein thrombosis. See Motion at 3. Regarding his cellulitis, Gonzales explains that, "in United States v. Hansen, 07-CR-00520(KAM), 2020 WL 1703672 (E.D.N.Y. April 4, 2020), and United States v. York, Nos. 3:11-CR-76 and 3:12-CR-145, 2019 WL 3241166 (E.D. Tenn. July 18, 2019), cellulitis was among the ailments that led the courts to grant compassionate release to those defendants." Motion at 4. Gonzales emphasizes that United States v. York predates the COVID-19 pandemic. See Motion at 4. Gonzales next lists fifteen cases in which courts have granted compassionate release for persons with asthma. See Motion at 4-6 (collecting cases). Turning to his severe obesity, Gonzales explains that the CDC "lists it among conditions that can lead to bad outcomes from the Covid-19 and other illnesses." Motion at 6. Gonzales also identifies thirteen cases in which courts have granted compassionate release for persons with morbid obesity. Motion

at 6-8 (collecting cases).

Gonzales submits that his medical conditions render him "susceptible to a bad outcome should he re-contract the coronavirus which is ravaging the federal prison community at a rate 5.7 times higher than the community at large in the United States." Motion at 8.[9]  Gonzales also argues that his health risks are especially high at FCI Danbury, in comparison to the risk at other BOP facilities.  See Motion at 8.  He notes that former Attorney General William Barr has "singled out FCI Danbury and two other institutions as being particularly impacted by the Covid-19."  Motion at 8.  Gonzales also discusses a class action which the inmates of FCI Danbury filed against the Danbury Warden and the BOP.  See Motion at 9.   Gonzales explains that, in the class action, the Honorable Michael P. Shea, United States District Judge for the United States District Court for the District of Connecticut, granted the inmate plaintiffs' temporary restraining order because the "plaintiffs were substantially likely to prevail on their eighth amendment claim of deliberate medical indifference . . . ."  Motion at 9 (citing Martinez-Brooks v. Easter, 459 F. Supp. 3d 411 (D. Conn. 2020)(Shea, J.)).

      **b.**        **The First Step Act.**

Gonzales asserts that, under the First Step Act, "Congress allowed the sentencing courts to entertain motions for compassionate release filed by defendants."  Motion at 10.  Gonzales explains that, pursuant to the First Step Act, he has exhausted properly his administrative remedies.  See Motion at 10.  Gonzales notes that, although 241 FCI Danbury inmates have submitted

---

[9]An updated version of the graph to which Gonzales cites notes that there are 17.87 COVID-19 infections per 1,000 people in the United States currently.  See BOP Reported Positive Tests for COVID-19 Nationwide, Federal Defenders of New York, https://federaldefendersny.org (last visited April 2, 2021)("BOP COVID Statistics").  By contrast, there are 86.07 COVID-19 infections per 1,000 people in the Bureau of Prisons.  See BOP COVID Statistics.

compassionate release requests to the Warden during the COVID-19 pandemic, the Warden has not approved any of the requests.  See Motion at 14.  Gonzales then argue that "extraordinary and compelling reasons," -- specifically, his "multiple serious health conditions" -- warrant a reduction in his sentence.  Motion at 11.  Gonzales notes that the Sentencing Commission has described four examples of extraordinary and compelling reasons, including the "medical condition of the defendant, including terminal illness and serious physical or medical conditions that 'that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.'"  Motion at 12 (quoting U.S.S.G. § 1B1.13, n.1).  Gonzales contextualizes this definition, noting that, because the Sentencing Commission has not had a quorum in several years, "it has been unable to amend USSG § 1B1.13 to respond to the expanded availability of compassionate release and Congress' intent that it be more widely granted."  Motion at 13.

c.      **Section 3553(a) Factors.**

Gonzales contends that the factors in 18 U.S.C. § 3553(a) weigh in favor of his release. See Motion at 15.  First, Gonzales argues that FCI Danbury has exhibited deliberate indifference to Gonzales' medical care, including: (i) "failure to treat Mr. Gonzales' cellulitis until he became septic"; and (ii) taking "two weeks to fill the prescription" for Gonzales' antibiotics after he was hospitalized with COVID-19.  Motion at 16.  Gonzales also emphasizes the dangers associated with COVID-19 in prisons and insists that his combination of medical conditions make the virus particularly dangerous for him.  See Motion at 17-18.  Gonzales notes that he contracted COVID-19 previously, and was hospitalized twice.  See Motion at 21.  Gonzales maintains, however, that the "crush of infected inmates at Danbury and the documented medical indifference leave him vulnerable to succumbing to some other ailment," and notes that he could contract COVID-19

again.  Motion at 21.  Gonzales also argues that COVID-19 poses "another risk . . . life threatening complications of his DVT."  Motion at 25.  Gonzales also believes he has a heightened risk of stroke based upon COVID-19.  See Motion at 25.  Gonzales notes that, in several cases, courts have granted compassionate release to inmates following their recovery from COVID-19.  See Motion at 26 (citing United States v. Kriglstein, No. CR 16-0663-JH, Order Staying Compassionate Release, filed April 27, 2020 (Doc. 60)(Herrera, J)).  He reiterates that his "combination of ailments make him vulnerable to serious illness or death."  Motion at 36.

Gonzales argues that, while in prison, he "has rehabilitated himself and he presents no danger to the community."  Motion at 26.  Gonzales asserts that he is "incarcerated at a low security institution, and his pattern score indicates minimal risk for re-offense."  Motion at 26.  Moreover, he emphasizes that his post-offense conduct has complied continuously with the law:

> Gonzales was not indicted until two years after the search warrant was executed . . . , and committed no new crimes during that period.  He was then free on pretrial services supervision for an extensive period both pre-sentence pre-voluntary surrender to the BOP.  During this time he had no problems.  Of special note is that it was a prescription pain pills addiction that led to his crimes, and yet he tested drug free during this entire time . . . .

Motion at 26-27.  Further, at FCI Danbury, Gonzales has taught a GED preparation course to inmates with disabilities.  See Motion at 27.  Gonzales argues that post-offense rehabilitation is an important factor which the Court should consider.  See Motion at 27 (citing Pepper v. United States, 562 U.S. 472, 490 (2011)).  Gonzales notes that, were the Court to release him, he would live with his parents on their lavender farm, where he would assist with "the bookkeeping and administration of the farm" while receiving Medicaid benefits.  Motion at 28.  Gonzales concludes that "[a]s with so many prisoners, Mr. Gonzales may deserve punishment, but not a death sentence, and he has served a substantial period of time not only without incident, but with exceptional

behavior and service to other inmates and the facility." Motion at 28.

**2.** **The First Supplement.**

On May 18, 2020, Gonzales provided the Court with "hospital records in support of his motion for compassionate release, by means of this sealed supplement." Jason Gonzales' Sealed Supplement to Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act at 1, filed May 18, 2020 (Doc. 137)("First Supp."). The hospital records summarize Gonzales' hospitalizations during his time as an inmate at FCI Danbury. See First Supp. at 1. The hospital records also detail Gonzales' medical diagnoses. See First Supp. at 1.

**3.** **The Response.**

The United States responds to Gonzales' Motion. See Memorandum of the United States in Response to Jasonn Gonzales' Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act, filed June 1, 2020 (Doc. 138)("Response"). The United States concedes that Gonzales "has exhausted his administrative remedies, and that he has presented extraordinary and compelling reasons, within the meaning of 18 U.S.C. § 3582(c)(1)(A), in support of his motion." Response at 1. Nonetheless, the United States argues that the Court should not grant the Motion, because Gonzales has not shown that he would not be dangerous to the community if released, and because he has not satisfied the § 3553(a) factors. See Motion at 1.

The United States nest argues that the BOP "has taken aggressive steps to protect inmates' health and to resist the spread of COVID-19." Motion at 2. The United States notes that the BOP has detailed protocols in place to mitigate the spread of infectious diseases in prisons. See Motion at 2. The United States then summarizes a variety of administrative opportunities available to federal prisoners during COVID-19. See Motion at 5. For example, the BOP may transfer inmates to home confinement, provide inmates with furlough, or grant inmates' initial applications for

compassionate release.  See Motion at 6.  The United States notes that 18 U.S.C. § 3621(b) prohibits judicial review of BOP placement decisions.  See Motion at 5.

The United States explains its current position on extraordinary and compelling circumstances:

> It is the currently the position of the Department of Justice that, during the COVID-19 pandemic, an inmate who presents one of the medical conditions identified by the CDC as risk factors placing individuals at higher risk of severe outcomes from COVID-19, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason allowing consideration of compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release.

Motion at 11.  The United States admits that Gonzales' asthma and severe obesity "are clearly identified as risk factors by the CDC," and are "chronic conditions from which he cannot reasonably be expected to recover."  Motion at 13.  The United States then admits that Gonzales' case satisfies the extraordinary and compelling circumstances requirement.  See Motion at 13.

The United States contends, however, that "there is an insufficient basis for the Court to find that the defendant is not a danger to the safety of any other person or of the public."  Motion at 14.  The United States also expresses concern that, if released, Gonzales would reoffend.  See Motion at 14.  It notes that Gonzales served previously a term of imprisonment before his present period of incarceration.  See Motion at 15.  The United States argues that the Court should require Gonzales to provide further detail regarding his release plan.  See Motion at 15.  The United States explains that Gonzales "suggests that he will provide financial or accounting services for the family business.  As the Court will recall, these are some of the same skills that the defendant used to commit the offenses of his conviction."  Motion at 15-16.

The United States next addresses the § 3553(a) factors.  See Motion at 16.  The United

States argues that "the nature and circumstances of the offense of conviction obviously have not changed in light of the COVID-19 pandemic," and focuses on the Court's previous Memorandum Opinion and Order describing its rationale for imposing Gonzales' sentence.  See Motion at 19. The United States admits, however, that  Gonzales' "history and characteristics . . . have changed since sentence was originally imposed."  Motion at 19.  Nonetheless, the United States concludes that Gonzales "has not provided sufficient information to show that the § 3553(a) factors which previously supported a term of incarceration of 111 months now support a sentence of essentially one half that term."  Motion at 19.  Last, the United States asks that, if the Court releases Gonzales, it "should order a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the defendant to the public."  Motion at 19.

    **4.**       **The Reply.**

Gonzales replies to the United States' Response.  See Reply at 1.  Gonzales first summarizes the parties' positions.  See Reply at 1.  He explains that he and the United States agree that: (i) "he has exhausted his BOP administrative remedies"; and (ii) he presents compelling and extraordinary circumstances.  Reply at 1.  Gonzales observes that the parties disagree whether Gonzales: (i) "present[s] a danger to the community"; and (ii) "merits release pursuant to the 18 U.S.C. § 3553 factors."  Reply at 1.  Gonzales also emphasizes that the United States "claims that BOP is doing an excellent job controlling the Covid-19 outbreak and that it offers many remedies administratively.  The defense forcefully disagrees with those assertions . . . ."  Reply at 1.

Gonzales first contends that he has met his burden to demonstrate that he is no longer a danger to the community.  See Reply at 2.  Gonzales notes that the United States has mistakenly "give[n] no weight to the changed post-sentencing circumstances."  Reply at 3.  Gonzales identifies

key post-conviction circumstances which indicate that he is unlikely to reoffend:

> The Court has ample evidence to conclude, under the preponderance standard, that an individual who:
>
> - committed no new crimes in the roughly two years between when the search warrant was served and prosecution commenced,
>
> - then complied with pretrial services during the 26 months between indictment and voluntary surrender,
>
> - now has served over four years in the BOP without any disciplinary write-ups, and
>
> - who has engaged in extensive rehabilitative and vocational programming,
>
> no longer presents the risk that he did while addicted and committing these offenses between January 2009 and May 2012.

Reply at 3. Gonzales then discussed his rehabilitative efforts since committing the underlying offenses, noting that he:

- has the extremely unusual and highly responsible position of being a GED teacher for special needs students

- has no disciplinary history whatsoever

- has engaged in extensive programming

- complied completely with pretrial services during the seven and a half months between arrest and sentencing

- complied completely with pretrial services during the seventeen months between sentencing and commencement of his sentence

- voluntarily surrendered himself to FCI Big Spring as ordered

- has a home and a job along with support from his family

- has matured and gotten a clearer picture on how to live his life and where he went wrong

Reply at 4-5. Gonzales also explains the importance of his relationship with his daughter, noting

that he has maintained close contact with her during his incarceration. See Reply at 5. Regarding his proposed employment after incarceration, he explains that he "would not be a signer on any bank accounts nor have access credit card or personal identifying information." Reply at 6.

Gonzales then contends that the BOP does not provide "adequate medical care, repeatedly endangering Mr. Gonzales' life." Reply at 6. Gonzales provides examples of this inadequate care, including that: (i) Gonzales "ended up in the hospital because a leg infection was ignored until he became septic and almost died" and (ii) "[w]hen he went to the hospital for a second time due to coronavirus respiratory distress, the hospital made it clear that he needed a Z-pack for relief of these symptoms, but Danbury took two weeks to get around to filling that prescription"; Gonzales insists that these are not "isolated incidents." Reply at 6-7. Gonzales also criticizes the administrative remedies available purportedly to him via the BOP. See Reply at 9. For example, Gonzales maintains that the "BOP can, but is not, granting early release to home detention under the CARES Act." Reply at 9. Gonzales also notes that "he was convicted of an economic crime," and that "even violent offenders have been granted compassionate release." Reply at 11.

Regarding his prison experience, Gonzales writes:

This experience has been an eye opener. I just hope I get the opportunity to prove that I'm not only ready to be a productive member of society but I only wish to do things the right way and establish myself. It's all I think about. I have no desire to repeat those bad choices. I want a good life I can be proud of and my daughter can be proud of her father. I will earn that come hell or high water.

Reply at 13. Gonzales also argues that his desire to be a good father to his daughter will deter him from committing future crimes. See Reply at 13. Gonzales then notes that the Court ordered him to pay restitution to the victims of his crimes, which he will be more easily able to do when he can earn a higher wage outside of prison. See Reply at 14. Gonzales also disagrees with the United States' quarantine requests, explaining that Gonzales can quarantine successfully at home. See

Reply at 15. Gonzales asks that, because of the "dire conditions at Danbury, . . . that this Court order him released and include a requirement to quarantine at his rural home where he will stay in his own bedroom, rather than order him to quarantine in a 100 man dorm at Danbury prior to release." Reply at 15.

     **5.**      **The Post-Conviction Memorandum.**

     The United States Probation Office ("USPO") conducted a Compassionate Release Investigation as to Gonzales and filed a report with the Court. See Post-Conviction Memo. at 1. The USPO explains that it has conducted a virtual visit of Gonzales' proposed residence. See Post-Conviction Memo. at 1. The USPO notes that the proposed residence is "suitable . . . and no concerns were noted during the visit." Post-Conviction Memo. at 1. The USPO also concludes that Gonzales' "parents . . . seem to be extremely supportive." Post-Conviction Memo. at 1.

     **6.**      **The Hearing.**

     The Court held a hearing on July 20, 2020. See Clerk's Minutes at 1. The Court explained that it was "very disappointed" in the United States' "blanket approach" in conceding the exceptional and compelling circumstances element in all compassionate release where a defendant has a pre-existing condition that may heighten his or her risk of becoming severely ill due to COVID-19. Transcript of a Hearing at 3:3-15 (taken July 20, 2020)(Court)("Tr.").[10] The Court therefore requested that Gonzales address this prong of the compassionate release analysis. See Tr. at 3:3-15 (Court). Gonzales noted that his variety of "maladies" make his circumstances extraordinary and compelling, with the "top one" being obesity. Tr. at 3:11-16 (Court, Converse). Gonzales also asserted that he has been twice hospitalized after contracting COVID-19. See Tr.

_____

[10]The Court's citations to the transcript of the hearings refer to the court reporter's original, unedited versions. Any final transcript may contain slightly different page and/or line numbers.

at 5:15-6:1 (Converse). Gonzales continued that there is a risk that he may become re-infected with COVID-19. See Tr. at 10:18-25 (Converse). Gonzales then detailed his problems with cellulitis and deep vein thrombosis:

> Cellulitis is a skin infection . . . and it's often caused by poor circulation. The problem with cellulitis is that it can go internal as well. It can produce a system-wide infection, which has happened three times, I believe. He has been hospitalized at least three times while in the last 51 months for cellulitis. And when a person goes septic, they're in grave danger of dying, and some of the records we submitted confirm that that happened to him. So he's got the circulation problem already. He's got deep vein thrombosis, which is a circulatory problem, clotting. So we're already got someone who is going to be vulnerable to stroke, and having had the coronavirus he's more vulnerable to strokes in the future.

Tr. at 12:11-13:1 (Converse). Additionally, Gonzales explained that he has "obstructive sleep apnea and asthma, two different respiratory ailments." Tr. at 13:1-3 (Converse). Gonzales then argued that the Court is not "constrained by the strict language" of the U.S.S.G. in evaluating extraordinary and compelling circumstances. Tr. at 16:1-14 (Converse).

The United States responded that it "concede[s]" that Gonzales "presents more than one medical conditions identified by the CDC as risk factors" for COVID-19 complications, and, "therefore we take the position that the defendant has presented an extraordinary compelling reasons under the statute." Tr. at 22:17-23 (Gerson). The Court asked the United States to "express up the chain of command that I don't think what the Department of Justice has done is helpful. We have to go into these cases one at a time and evaluate it and we don't get to take a blanket approach"; the United States agreed to "make sure the department hears about" the Court's concerns. Tr. at 23:9-13 (Court, Gerson).

Next, Gonzales updated the Court regarding his current health situation at Danbury:

[H]e had yet had another out-break of cellulitis that he's currently managing at the prison. There are going to be giving him a very strong antibiotic, and when he has the cellulitis and he feels that way he's in danger of becoming septic like it has so

> many in the times in the past and that puts an increased strain on his breathing which
> is already -- because of the COPD and the obstructive sleep apnea and the
> asthma . . . . [I]t's further strained on an already stretched respiratory system.

Tr. at 25:13-23 (Converse).  The Court asked whether Gonzales would receive better care near his

proposed home in Abiquiu, because it has limited medical facilities.  See Tr. at 25:24-26:2 (Court).

In response, Gonzales described two medical facilities in Abiquiu where he could receive care.

See Tr. at 26:3-4 (Converse).  The Court remained skeptical, adding that "we're speculating that

he's going to get better care in Abiquiu than he's going to get in Danbury."  Tr. at 27:19-22 (Court).

Addressing the § 3553(a) factors, Gonzales argued that he is unlikely to reoffend, that he

has a low "PATTERN score,"[11] and that he would reside in a rural setting if the Court released

him from prison.  Tr. at 28:17-29:4 (Converse).  Gonzales also discussed his time in prison, noting

that he has "had no discipline," has "done a lot of programming," and is "actually a teacher there."

Tr. at 29:17-22 (Converse).  Gonzales reminded the Court that it has been over eight years since

he committed the underlying offense.  See Tr. at 30:1-3 (Converse).  Gonzales then noted that he

would have a job at his mother's lavender farm upon his release and that the job "will not provide

him access to any personal identifying information from any of the customers."  Tr. at 30:7-13

---

[11]The First Step Act:

> directed the Attorney General to develop a risk and needs assessment tool that could
> facilitate reducing recidivism and would prioritize the early release of any inmates
> who were found to pose a "minimum" or "low" risk of reoffending.  As a result,
> the Department of Justice (DOJ) worked with outside consultants to develop an
> algorithmic assessment tool, PATTERN, to classify each federal inmate as being
> minimum, low, medium, or high risk of reoffending.

Amy B. Cyphert, Reprogramming Recidivism: The First Step Act and Algorithmic Prediction of
Risk, 51 Seton Hall L. Rev. 331, 334-35 (2020).  Although Gonzales mentioned his low
PATTERN score at the hearing, the Court has received no supporting documentation of this score,
and, therefore, makes no findings based upon this score.

(Converse).  Gonzales also argued that it would be easier for him to pay restitution "if he was not earning the 25 cents an hour that he's earning in the BOP." Tr. at 31:1-3 (Converse).

The United States argued that Gonzales has not satisfied the § 3553(a) factors, because "the release plan here is pretty speculative" and lacks "adequate attention . . . to danger to the community." Tr. at 32:18-25 (Gerson).  The United States also maintained that Gonzales "was working for his mother at the time he committed the underlying crime . . . ." Tr. at 34:3-6 (Gerson).  The United States asked the Court to direct Gonzales to supplement his release plan to provide additional information about his work plans and available healthcare in Abiquiu.  See Tr. at 34:24-35:7 (Gerson).  Gonzales responded that he did not know "how we could have any more specific of a release plan than we have.  We have provided an address" and "the job description . . . ." Tr. at 39:10-18 (Converse).  Gonzales also observed that he "was not living at home, he was not working for his parents," when he committed the underlying offense; thus "we're not talking about releasing him . . . to the same place." Tr. at 41:2-5 (Converse).  After the parties finished argument, the Court explained that it was "still pausing on the extraordinary and compelling circumstances" element of Gonzales' case, because "it doesn't have a feeling to me of being one that's compelling and exceptional." Tr. at 42:22-43:8 (Court).  The Court noted that it would not "say no today, but I'm leaning against it." Tr. at 44:2-4 (Court).

### 7.    The Post-Hearing Brief.

After the hearing, Gonzales submitted additional briefing to the Court.  See Brief at 1. Gonzales emphasizes that, since the Court sentenced Gonzales, "the evaluation of medical care and treatment under § 3553(a)(2)(D) is now dramatically different.  Mr. Gonzales' life has been and continues to be threatened." Brief at 1.  Gonzales explains that "as of the filing of this brief," he "is again battling cellulitis." Brief at 2.

Gonzales argues that, in passing the First Step Act, Congress hoped to expand both the reasons that compassionate release can be granted and the parties which may grant compassionate release requests. See Brief at 2. Gonzales continues that "Congress' intent was for courts to be able to determine what other matters constitute compelling and extraordinary reasons under the catchall provision." Brief at 3. Specifically, Gonzales notes that the U.S.S.G.'s extraordinary and compelling reasons definition is "not exclusive, and that it was Congress' intent to allow Courts to determine what factors constitute extraordinary and compelling reasons." Brief at 4 (citing United States v. Urkevich, No. 8:03CR37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019)(Camp, J.), appeal dismissed, No. 20-1603, 2020 WL 5642024 (8th Cir. April 1, 2020)). Gonzales also suggests that Congress implemented the First Step Act's compassionate release provision, "because the BOP failed at providing compassionate release where merited." Brief at 9. Gonzales argues that, despite the Department of Justice's ("DOJ's") concession regarding the extraordinary and compelling circumstances prong of the compassionate release analysis, "individualized consideration still exists" via § 3553(a). Brief at 10. Gonzales then notes that his BMI is "almost double the CDC cutoff" for obesity. Brief at 12. Gonzales avers that he is afraid that "he would not survive a second bout of the virus, and believes he was only able to survive this through near-constant use of his inhaler." Brief at 14. Gonzales notes that, if released to his proposed home in Abiquiu, he would be twenty "minutes from the Española Presbyterian Hospital, where he and his medical conditions are well known to the medical staff there." Brief at 16. Gonzales maintains that, at FCI Danbury, by contrast, "he is still awaiting treatment for a fall that injured his knee last winter" and "non-emergency consults are on hold during the pandemic . . . ." Brief at 16.

Gonzales summarizes the poor medical care he alleges that he has received "throughout his imprisonment":

> At one point in 2019 he was suffering an asthma attack, but was out of the liquid albuterol he needed for a nebulizer treatment. The nurse told him to wait until she finished the pill line. About an hour and a half later, he asked for the nurse, and was told to wait until called. An hour and a half later, he asked again and was told that she had left the facility. During a bout of cellulitis at Big Spring, he was diagnosed and prescribed intravenous . . . antibiotic. A friend wheeled him to the clinic and they were also told until the med tech completed the pill line. The tech never came back and eventually they were told to report back to their units for evening lockdown. This was critically dangerous since there is a small window of time to treat the cellulitis before it turns into life-threatening sepsis.

Brief at 17. Gonzales implores the Court to grant his Motion, because he "has suffered in prison in a way this Court could not have expected. What can be expected is that he will continue to be very vulnerable to illness and possibly even death." Brief at 18.

### 8.    The Second Supplement.

Gonzales provided additional records to the Court, documenting further his health problems. See Second Supp. at 1. Specifically, Gonzales reports "another leg infection on July 20 requiring antibiotic treatment, rash and bruising possibly related to COVID-19, and with knee pain for the last four months, unrelieved by over the counter medications." Second Supp. at 1. Gonzales contends that the "mini-bleeds" the rash causes "could indicate an increased potential for stroke." Second Supp. at 2. Gonzales also discusses "bruising all over" his body and continual pain. Second. Supp. at 2-3.

### 9.    The Third Supplement.

Gonzales provides the Court with "updated medical information and supplemental legal authority." Third Supp. at 1. Gonzales notes that, since his last update to the Court, he "has put in multiple sick call requests over the last three weeks and has written to administration, and has neither been seen nor treated for his condition, which he reports involves rash, bruising, and itching and pain so severe they keep him from sleeping at night." Third Supp. at 1. Gonzales also cites United States v. Brooker, 976 F.3d 228 (2d Cir. 2020), contending that, there, "the court found

that the First Step Act rendered restrictions on the definition of 'compelling and extraordinary reasons' inapplicable to defendant-filed motions."  Third Supp. at 1-2 (quoting U.S.S.G. § 1B1.13, n.1(D)).

10.     **The Fourth Supplement.**

Gonzales provides the Court with updated information about COVID-19 reinfection.  See Fourth Supp. at 1.  Gonzales attaches a press release about an inmate who twice tested positive for COVID-19, "months apart . . . , and the second time he became infected with the COVID-19, he succumbed to the disease."  Fourth Supp. at 1.

11.     **The Fifth Supplement.**

Gonzales updates the Court with additional decisions from Courts of Appeals regarding how to evaluate "what constitutes extraordinary and compelling reasons that may merit compassionate release."  Jasonn Gonzales Second Notice of Supplemental Authority at 1, filed December 3, 2020 (Doc. 151)("Fifth Supp.").  Gonzales explains that, according to these recent decisions, "district courts are not limited by U.S.S.G. § 1B1.13 or the BOP 5050.50."  Fifth Supp. at 1.  Gonzales relies upon United States v. Brooker, 976 F.3d at 234; United States v. Jones, 980 F.3d 1098 (6th Cir. 2020); United States v. Gunn, 980 F.3d 1178 (7th Cir. 2020); and United States v. McCoy, 981 F.3d 271 (4th Cir. 2020).  See Fifth Supp. at 1-3.

12.     **The Sixth Supplement.**

Gonzales supplements the Motion with "updated information regarding FCI Danbury's failure to provide minimally adequate medical care for its inmates."  Sixth Supp. at 1.  Gonzales explains that his skin conditions continue to worsen and "have progressed so far that they emit a foul smell."  Sixth Supp. at 1.  Gonzales also submits that he was again hospitalized "last month for respiratory distress."  Sixth Supp. at 1.  Gonzales emphasizes that "FCI Danbury is not properly

caring for him or its other inmates, but particularly Mr. Gonzales." Sixth Supp. at 1.

13.     **The Seventh Supplement.**

Gonzales again supplements the Motion "with updated information regarding FCI Danbury's failure to provide minimally adequate medical care for its inmates." Seventh Supp. at 1 ("Seventh Supp."). Gonzales submits that the New York Times published recently an investigative report describing "the lack of medical care at FCI Danbury." Seventh Supp. at 1 (citing Roni Caryn Rabin, Vulnerable Inmates Left in Prison as Covid Rages, N.Y. Times (Feb. 24, 2021), https://www.nytimes.com/2021/02/27/health/coronavirus-prisons-danbury.html). Gonzales argues that this article demonstrates the "indifferent and inadequate medical care previously shown by Mr. Gonzales continues . . . ." Seventh Supp. at 1.

14.     **The Eighth Supplement.**

Gonzales updates the Court regarding a new Tenth Circuit opinion on compassionate release, McGee, 992 F.3d 1035. See Jason Gonzales' Third Notice of Supplemental Authority, filed March 30, 2021 (Doc. 155)("Eighth Supp."). Gonzales characterizes McGee, stating that "the Tenth Circuit followed the Second, Fourth, Sixth, and Seventh Circuits . . . finding that USSG § 1B1.13 was inapplicable to inmate-filed motions and courts, not the BOP, determine what constitutes extraordinary and compelling circumstances." Eighth Supp. at 1.

## LAW REGARDING COMPASSIONATE RELEASE UNDER THE FIRST STEP ACT

"A federal court generally 'may not modify a term of imprisonment once it has been imposed.'" Dillon v. United States, 560 U.S. 817, 819 (2010)(quoting 18 U.S.C. § 3582(c)). The First Step Act of 2018, Pub. L. No. 115- 39132 Stat 5194 (December 21, 2018)("First Step Act"), however, amended § 3582 to expand district courts' power to reduce defendants' sentences after they have been imposed by "increas[ing] the use and transparency of compassionate release."

Before the First Step Act, 18 U.S.C. § 3582 permitted only the BOP Director to ask the court for a defendant's compassionate release. See, e.g., United States v. Smartt, 129 F.3d 539, 541 (10th Cir. 1997)(explaining that a prisoner was not eligible for compassionate release absent motion from BOP Director). The First Step Act adds the following language:

> [O]r upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

18 U.S.C. § 3582. Defendants, therefore, may petition the court for compassionate release after exhausting administrative remedies. See United States v. Gieswein, 832 F. App'x 576, 577-78 (10th Cir. 2021)(stating that "[f]ollowing the passage of the First Step Act, a district court may only consider a defendant's motion" after the defendant has exhausted the administrative remedies available via the BOP).[12] Specifically, a defendant may seek a reduction in sentence directly from the court, provided that: (i) the defendant first seeks a reduction from the BOP; and (ii) that request has either (a) been denied; or (b) thirty days have passed since the original request. See 18 U.S.C. § 3582(c)(1)(A). A court may grant a compassionate release motion where the defendant: (i)

---

[12]United States v. Gieswein is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that United States v. Gieswein, and the other unpublished opinions cited here, have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

presents extraordinary and compelling reasons which warrant a sentence reduction; (ii) a sentence reduction is consistent with applicable policy statements from the Sentencing Commission; and (iii) a sentence reduction aligns with the 18 U.S.C. §3553(a) factors to the extent that they apply. See 18 U.S.C. § 3582(c)(1)(A); United States v. Jones, 980 F.3d at 1108. Defendants must satisfy all three requirements, and "'district courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others.'" McGee, 992 F.3d at 1043 (quoting United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021)).

### 1. Defendants in the Tenth Circuit Must Exhaust Their Administrative Remedies Before Bringing a Compassionate Release Motion Before a District Court.

The Tenth Circuit has concluded that, even amidst the COVID-19 pandemic, that the exhaustion requirement is not subject to waiver. See United States v. Johnson, No. 20-6103, 2021 WL 1053706, at *2 (10th Cir. March 19, 2021)("In this circuit, however, § 3582(c)(1)(A)'s exhaustion requirement is mandatory, rather than judicially waivable."). See also United States v. Baca, No. CR 16-1613 JB, 2020 WL 5369078, at *13 (D.N.M. Sept. 8, 2020)(Browning J.)(explaining that a defendant "must fulfill the exhaustion requirement for the Court to have subject-matter jurisdiction"); United States v. Heath, No. CR-13-102-SLP, 2020 WL 1957916, at *2 (W.D. Okla. April 23, 2020)(Palk, J.)(collecting cases)(citing United States v. Bell, No. 16-20008-02-DDC, 2020 WL 1923086, at *2 (D. Kan. April 21, 2020)(Crabtree, J.); United States v. Gonzalez, No. 18-cr-00310-PAB, 2020 WL 1905071, at *2-3 (D. Colo. April 17, 2020)(Brimmer, C.J.); United States v. Perry, No. 18-cr-0480-PAB, 2020 WL 1676773, at *1 (D. Colo. April 3, 2020)(Brimmer, C.J.)).

Some courts outside of the Tenth Circuit, however, have determined that they can waive the exhaustion requirement. See, e.g., United States v. Perez, No. 17-CR-513-3, 2020 WL

1546422, at *2 (S.D.N.Y. April 1, 2020)(Torres, J.); United States v. Colvin, No. 19-CR-179, 2020 WL 1613943, at *2 (D. Conn. April 2, 2020)(Arterton, J.)("[I]n light of the urgency of Defendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A)."). In United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020), for instance, the United States Court of Appeals for the Third Circuit characterizes § 3582(c)(1)(A)'s exhaustion requirement as "a glaring roadblock foreclosing compassionate release." United States v. Raia, 954 F.3d at 597. The Third Circuit does not state definitively whether it believes the exhaustion requirement is jurisdictional. It states, however, that remand to the district court "would be futile," because the defendant did not comply with § 3582(c)(1)(A)'s exhaustion requirement. United States v. Raia, 954 F.3d at 597. Some courts have interpreted this statement as the Third Circuit treating the exhaustion requirement as jurisdictional, see United States v. Davis, No. 19-CR-64-F, 2020 WL 2465264, at *2 (D. Wyo. May 13, 2020)(Freudenthal, J.)(stating that "the only circuit court opinion on this issue" concludes that the "30 day waiting period (or exhaustion of all administrative remedies) is jurisdictional")(citing United States v. Raia, 954 F.3d at 597).

The United States Court of Appeals for the Fifth Circuit recently touched upon whether the exhaustion requirement is jurisdictional. In Valentine v. Collier, 956 F.3d 797 (5th Cir. 2020), the Honorable Stephen A. Higginson, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, suggests that courts could excuse the First Step Act's exhaustion requirement. See 956 F.3d at 807 (Higginson, J., concurring). In his concurrence, Judge Higginson notes that several courts have concluded that the exhaustion requirement "is not absolute and that it can be waived by the government or by the court, therefore justifying an

exception in the unique circumstances of the COVID-19 pandemic." Valentine v. Collier, 956 F.3d at 807 (citing e.g., United States v. Russo, No. 16-cr-441 (LJL), 2020 WL 1862294, at *405 (S.D.N.Y. April 14, 2020). Judge Higginson's citation to these cases suggests that he agrees that either courts or the United States can excuse the exhaustion requirement.

In United States v. Alam, 960 F.3d 831 (6th Cir. 2020), the Honorable Jeffrey Sutton, United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, concludes that the First Step Act's exhaustion requirement is not jurisdictional: "Nothing in this administrative exhaustion requirement clearly limits our jurisdiction. It merely imposes a requirement on prisoners before they may move on their own behalf . . ." 960 F.3d at 833. He notes that, the "Supreme Court has worked over the last decade or so to distinguish between jurisdictional rules (that bear on the competence of courts to hear a claim) and non-jurisdictional mandatory rules (that do not)," and that "key" differences between the these two rules have emerged. See United States v. Alam, 960 F.3d at 833 (citing Arbaugh v. Y & H Corp., 546 U.S. 500, 516 (2006)). Judge Sutton focuses on one difference: courts must raise jurisdictional defects sua sponte and cannot permit the parties to waive or ignore these defects, whereas courts must resolve mandatory-claim-processing defects only when the parties raise them. See 960 F.3d at 833 (citing Gonzalez v. Thaler, 565 U.S. 134, 141 (2012); Eberhart v. United States, 546 U.S. 12, 19 (2005)(per curiam)). Looking at the text of the exhaustion requirement, Judge Sutton concludes that, because the provision "neither 'speak[s] in jurisdictional terms' nor 'refer[s] in any way to the jurisdiction of the courts," the provision appears to be a claim-processing rule and functions as a claim-processing rule. See United States v. Alam, 960 F.3d at 833 (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394 (1982))(alterations in United States v. Alam).

In contrast to the Third, Fifth, and Sixth Circuits, the Tenth Circuit has continued to impose

the exhaustion requirement as mandatory and not judicially waivable despite the COVID-19 pandemic. In United States v. Johnson, the Tenth Circuit affirmed the district court's dismissal of a prisoner's compassionate release motion because the prisoner had not exhausted her administrative remedies. See 2021 WL 1053706, at *1. The Honorable Carolyn B. McHugh, United States Circuit Judge for the Tenth Circuit, authored the opinion and explained, that, following the First Step Act, a prisoner "may bring such a motion in the district court on her own behalf." 2021 WL 1053706, at *1. Judge McHugh cautioned, however, that, "[i]f the prisoner does so, . . . she must first exhaust her administrative remedies." 2021 WL 1053706, at *1. Judge McHugh acknowledged that, as the defendant argued, other jurisdictions have held that the administrative exhaustion requirement is judicially waivable in light of the COVID-19 pandemic. See 2021 WL 1053706, at *1. Judge McHugh clarified that, in the Tenth Circuit, the "exhaustion requirement is mandatory, rather than judicially waivable." 2021 WL 1053706, at *1 (citing United States v. Gieswein, 832 F. App'x 576, 577-78 (10th Cir. 2021); and United States v. Springer, 820 F. App'x 788, 791-92 (10th Cir. 2020)). Moreover, Judge McHugh emphasized that "every other Court of Appeals to have addressed the issue has agreed" that the exhaustion requirement is not judicially waivable. 2021 WL 1053706, at *2. Consequently, Judge McHugh concluded that, because the defendant did not "demonstrate that she satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement, the district court properly rejected her request for relief under the statute." United States v. Johnson, 2021 WL 1053706, at *2 (10th Cir. March 19, 2021)

2. **A Defendant Must Also Satisfy 18 U.S.C. § 3582(c)(1)'s Tripartite Test to Qualify for Compassionate Release under the First Step Act.**

To qualify for a reduced sentence via a compassionate release motion, a defendant must satisfy the three elements 18 U.S.C. § 3582(c)(1) mandates:

(1) the district court finds that extraordinary and compelling reasons warrant such a reduction; (2) the district court finds that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the district court considers the factors set forth in § 3553(a), to the extent that they are applicable.

United States v. Maumau, 993 F.3d 821, 831 (10th Cir. 2021)(Briscoe, J.)("Maumau"). The Tenth Circuit has held that there are no current applicable policy statements from the Sentencing Commission. See McGee, 992 F.3d at 1050 ("'Because Guideline § 1B1.13 is not applicable to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling.'")(quoting United States v. Brooker, 976 F.3d 228, 236 (2d Cir. 2020)); Maumau, 993 F.3d 821, 837 ("[T]he Sentencing Commission's existing policy statement is applicable only to motions filed by the Director of the BOP, and not to motions filed directly by defendants").[13] Cf.

_____

[13]While the Court, as a district court, must faithfully and fully follow and apply Tenth Circuit law, the Court is puzzled by the Tenth Circuit's instruction that the district court should disregard entirely the Policy Statement of U.S.S.G. § 1B1.13.

U.S.S.G. § 1B1.13 provides in pertinent part:

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that --

(1)
    **(A)**    Extraordinary and compelling reasons warrant the reduction; or

    **(B)**    The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

 

     **(2)**      The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

     **(3)**      The reduction is consistent with this policy statement.

U.S.S.G. 1B1.13.

The application notes describe the U.S.S.G.'s conception of extraordinary and compelling reasons:

**Extraordinary and Compelling Reasons. --** Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

     **(A)**     **Medical Condition of the Defendant.**

          **(i)**     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

          **(ii)**    The defendant is --

             **(I)**    suffering from a serious physical or medical condition,

             **(II)**   suffering from a serious functional or cognitive impairment, or

             **(III)** experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

**(B)** **Age of the Defendant. --** The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

**(B)** **Family Circumstances. --**

    **(i)** The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    **(ii)** The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

**(D)** **Other Reasons. --** As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

**2.** **Foreseeability of Extraordinary and Compelling Reasons. --** For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

**3.** **Rehabilitation of the Defendant. --** Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.

**4.** **Motion by the Director of the Bureau of Prisons.** -- . . . . The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community.

. . . .

**Background:** The Commission is required by 28 U.S.C. § 994(a)(2) to develop general policy statements regarding application of the guidelines or other aspects of sentencing that in the view of the Commission would further the purposes of sentencing (18 U.S.C. § 3553(a)(2)), including, among other things, the appropriate use of the sentence modification provisions set forth in 18 U.S.C. § 3582(c). In doing so, the Commission is authorized by 28 U.S.C. § 994(t) to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." This policy statement implements 28 U.S.C. § 994(a)(2) and (t).

U.S.S.G. § 1B1.13.

The Court cannot and will not apply any analyses that the Tenth Circuit has forbidden. In the Court's opinion, however, an "applicable policy statement" applying to compassionate release motions currently exists, but, under current Tenth Circuit law, the Court cannot apply it. The question is largely -- what does the phrase "applicable policy statement" mean? The Tenth Circuit essentially read this out of the statute, saying there are none. See McGee, 992 F.3d at 1048. But there is an on-point policy statement; the Tenth Circuit just does not want it to restrict the defendant's ability to be resentenced. See McGee, 992 F.3d at 1048. Cf. United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *7 (11th Cir. May 7, 2021)("There is no question that 1B1.13 is *the* policy statement the Commission adopted to comply with this statutory mandate."). It is hard to imagine a more "applicable" Policy Statement than the one that defines "extraordinary and compelling" reasons. U.S.S.G. § 1B1.13. The Tenth Circuit agrees "that Congress intended for the Sentencing Commission's policy statements to serve as guideposts for district courts under the second part of the statutory test . . . ." McGee, 992 F.3d at 1048. It avoids this statutory interpretation by saying that "§ 984(a)(2)(c) requires the Sentencing Commission to promulgate general policy statements regarding . . . the sentence modification provisions set forth in section . . . 3582(c) of title 18." McGee, 992 F.3d at 1048. "Of course, that does not make sense: if the policy statement is relevant to the motion and helpful for adjudicating the motion, then it must be an 'applicable' statement under the statute." United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *6 (11th Cir. May 7, 2021).

At first blush, it appears that this section must have come from the First Step Act, but no -- some version of this Policy Statement has been in the Guidelines since November 1, 2006. Congress was aware of the pre-First Step version of 18 U.S.C. § 3582(c)(1)(A), and did not change the "extraordinary and compelling" language; it merely allowed defendants to go directly to the federal court and not rely solely on the BOP to file a motion. Thus, there is no instruction in the First Step Act for the Commission to go draft new Policy Statements; Congress looked at the "applicable" policy statement when drafting the First Step Act. Under standard statutory rules of construction, Congress is presumed to know the state of the law that existed at the time it passed the First Step Act. See, e.g., Dewsnup v. Timm, 502 U.S. 410, 419 (1992)("When Congress amends the bankruptcy laws, it does not 'write on a clean slate.'")(quoting Emil v. Hanley, 318 U.S. 515, 521 (1943)); Cannon v. Univ. of Chicago, 441 U.S. 677, 696-97 ("It is always presumed

that our elected officials, like other citizens, know the law."); <u>Lindsey v. Lessee of Miller</u>, 31 U.S. 666, 669 (1832)("When in 1807 Congress passed the law, they must be presumed to have legislated on the then existing state of things."). There is no sound reason to conclude that Congress intended to change the existing law when it did not change the language of "extraordinary and compelling" in the statute. It is unclear why federal courts and litigants cannot continue to look at the Policy Statement, at least for guidance, in this area of law and must start totally afresh. As the Honorable Andrew L. Brasher, United States Circuit Judge for the United State Court of Appeals for the Eleventh Circuit, states:

> We disagree with that reasoning. The statute's procedural change does not affect the statute's or 1B1.13's substantive standards, specifically the definition of "extraordinary and compelling reasons." The Commission's standards are still capable of being applied and relevant to all Section 3582(c)(1)(A) motions, whether filed by the BOP or a defendant. And the structure of the Guidelines, our caselaw's interpretation of "applicable policy statement," and general canons of statutory interpretation all confirm that 1B1.13 is still an applicable policy statement for a Section 3582(c)(1)(A) motion, no matter who files it.

<u>United States v. Bryant</u>, No. 19-14267, 2021 WL 1827158, at *1 (11th Cir. May 7, 2021).

After <u>Booker</u>, while the U.S.S.G. Guideline ranges are no longer binding and mandatory, courts still look, in arriving at the appropriate sentence, at the Guidelines and, in fact, have to carefully calculate the Guidelines and take them into account. <u>See</u> <u>Hughes v. United States</u>, 138 S. Ct. 1765, 1772 (2018)("After this Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Guidelines are advisory only. But a district court still 'must consult those Guidelines and take them into account when sentencing.'")(quoting <u>United States v. Booker</u>, 543 U.S. at 264). Even if not binding, it would seem federal courts should still be forced to look at the Policy Statement for assistance. In other areas, the courts continue to look at the Guidelines after the First Step Act was passed, even though the Commission has not had a quorum and has not changed the Policy Statement language. <u>See</u>, <u>e.g.</u>, <u>United States v. Jackson</u>, 952 F.3d 492, 501 (4th Cir. 2020)(affirming the district court's consideration of a policy statement in a First Step Act case where the court "appropriately acknowledged that those authorities were not controlling but merely supportive of its evaluation"); <u>United States v. Allen</u>, 956 F.3d 355, 358 (6th Cir. 2020)(explaining that "[t]he Sentencing Commission has informally advised that regardless of whether resentencing under the First Step Act constitutes a plenary resentencing proceeding or a more limited sentence modification proceeding, 'the Act made no changes to 18 U.S.C. § 3553(a), so the courts should consider the guidelines and policy statements, along with the other 3553(a) factors, during the resentencing.'")(quoting <u>First Step Act</u>, ESP Insider Express (U.S. Sentencing Comm'n, Washington, D.C.), Feb. 2019, at 1, 8, https://www.ussc.gov/sites/default/files/pdf/training/newsletters/2019-special_FIRST-STEP-Act.pdf). The Tenth Circuit says that the passage of the First Step Act should have "prompted" the Commission to revise its Policy Statement. <u>Maumau</u>, 993 F.3d at 836. The Tenth Circuit does not cite anything in the statute or legislative history that the Commission had to promulgate a new Policy Statement or that Congress expected a revision. <u>See</u> <u>Maumau</u>, 993 F.3d at 836. It then says that the Commission has been unable to comply with its "statutory duty of promulgat[ion]," but,

again, does not cite to any statute or legislative history that says the Commission had to revise the Policy Statement. Maumau, 993 F.3d at 836. The Tenth Circuit later rejects the United States' definition of the Policy Statement, but says once again that the "commission has failed to fulfill its statutory duty to issue a post-First Step Act policy statement . . . ," once again without citing to anything in the statute or legislative history that says Congress imposed this duty. McGee, 994 F.3d at 1050.

The Court believes that the most logical interpretation, then, is that Congress knew about the Policy Statement and was telling federal courts to look at it; there is no other applicable Policy Statement. It is unlikely that Congress was referring to a nonexistent Policy Statement, and if it intended the Commission to write a new one, it could have said so. While the Tenth Circuit asserts that the Policy Statement was produced one month "before" Congress enacted the First Step Act, the fact that the Commission promulgated the Policy Statement while the First Step Act was being drafted, suggests the opposite of what the Tenth Circuit concludes; the Policy Statement is the "applicable" Policy Statement to which Congress is referencing and the only one. Moreover, the Sentencing Commission knew that the First Step Act was in progress when it updated the Policy Statement. And even if the federal courts do not, and should not, after Booker, consider the Policy Statement binding and mandatory, it is odd and unusual that the Tenth Circuit will reverse a district court for merely considering the Policy Statement. See, e.g., United States v. Carr, No. 20-1152, 2021 WL 1400705 (10th Cir. Apr. 14, 2021)(Tymkovich, C.J.)(reversing district court's compassionate release denial because it applied the Policy Statement).

A second reason that the Tenth Circuit's statutory construction is not compelling is that the Commission itself uses the word "applicable" in the Policy Statement. The Commission states that the "court may reduce a term of imprisonment . . . if, after considering the factors set forth in . . . 18 U.S.C. § 3553(a), to the extent that they are applicable . . . ." U.S.S.G. § 1B1.13. The Tenth Circuit does not appear to have a problem with the word "applicable" here, but, because it mandates that district courts ignore the Policy Statement, it also ignores Congress' order that the Court should consider three factors. It seems that the Tenth Circuit's test is, in fact, less friendly to defendants, despite its air of chastising the district court for its use of the Policy Statement. Even if the Court decides that the § 3553(a) factors merit a reduction, if the Court took up the Tenth Circuit's offer to go straight to the "extraordinary and compelling" test, it would rarely rule that factor favors the defendant. It appears that the Tenth Circuit's order takes away the defendant's right to have the court first decide the § 3553(a) factors, which often, following a lengthy prison sentence, weigh in favor of a reduction. See 18 U.S.C. § 3582(c)(1)(a)(stating that courts should consider whether extraordinary and compelling circumstances apply "after considering the factors set forth in section 3553(a) to the extent that they are applicable").

Third, the Commission, in producing the Policy Statement, expressly was responding "to Congress' mandate to the Sentencing Commission . . ." 28 U.S.C. § 994(t) to "describe what should be considered extraordinary and compelling reasons for the sentence reduction . . . ." Section 994(t) was enacted in 1984, and the First Step Act did not change the language of § 994(t) at all -- it was updated last in 2006. By the time that Congress was enacting the First Step Act, the Commission was doing exactly what Congress told it to do, so that there was not a gap when the First Step Act became law.

The Tenth Circuit also states that it rejects the Policy Statement because applying the Policy Statement would eliminate the "catch-all" provision that Congress intended to enact.

McGee, 992 F.35 at 1050.  The Tenth Circuit explains:

> specifically, treating the existing policy statement as continuing to be applicable would effectively eliminate, in all cases involving motions filed directly by defendants rather than the Director of the BOP, the "Other Reasons" (i.e., "catch-all") category that the Sentencing Commission clearly intended to exist. This is because the "catch-all" category, as described in the Sentencing Commission's existing policy statement, requires a determination by the Director of the BOP that extraordinary and compelling circumstances exist in a given case. But, in a case where the defendant has moved for relief under the statute, the Director of the BOP has necessarily *not* made any such determination. This is problematic and clearly undercuts not only Congress's intent to expand the use of compassionate release,[5] but also the Sentencing Commission's intent to recognize a "catch-all" category of cases in addition to those that fall within the narrow confines of the first three categories of cases. Thus, we reject the government's position.

McGee, 992 F.3d at 1050.  But it is not at all clear why a court could not consider the "catch-all" provision, too.  The Policy Statement does not say a district court cannot use a catch-all.  The Tenth Circuit creates one, so if a court is looking at the Policy Statement, it could use it, too.  This reason is particularly salient given that the Commission specifically provides for a catch-all and, after the Tenth Circuit says courts cannot look at the Policy Statement, the Tenth Circuit then also creates a catch-all and never says from where its catch-all comes.  The Tenth Circuit shows its true hand when it does not say that the Commission has violated the statute, but says "[t]his is problematic and clearly undercuts not only Congress' intent to explain the use of the compassion release, but also the Sentencing Commission's intent to recognize a 'catch-all' category of cases in addition to these that fall within these categories of cases."  McGee, 992 F.3d at 1050.  The Tenth Circuit seems to be saying that a catch-all should and does exist, but without the Policy Statement, it is not clear what its bounds are.

The Tenth Circuit then states:

> Although Congress undoubtedly knew that there would be some time lag between the time of the statutory changes it made with the First Step Act and the Sentencing Commission's issuance of a new policy statement recognizing those changes, it surely could not have known, and did not intend, that there would be a significant time lag, or that the Sentencing Commission would fail altogether to issue a new policy statement.

McGee, 992 F.3d at 1051, n.5.  This is a manufactured problem.  There is not a problem unless the Tenth Circuit creates a statutory duty that does not exist and ignores the already existing Policy Statement.  When Congress wanted new Guidelines or Policy Statements, it sure knew in the past how to order one.  See, e.g, 28  U.S.C § 994(a)(1)-(2) ("The  Commission . . . shall promulgate . . . general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further

the purposes set forth in section 3553(a)(2)"); § 994(a)(2)(B) (requiring the Commission to promulgate "general policy statements regarding . . . the conditions of probation and supervised release . . . .").

The Tenth Circuit's statements demonstrate its taste for a new Policy Statement rather than one mentioned in the First Step Act. The reader gets the feeling that the Tenth Circuit does not like the prior Policy Statement or Commission definition of "extraordinary and compelling" and wants a new one. In doing so, it creates issues that do not bind exist, and prevents courts from looking at the Policy Statement at all. McGee limits courts analyzing compassionate release applications for a time until the Tenth Circuit gets what it wants -- a new Policy Statement.

Finally, the Tenth Circuit instructs courts not to look at the Policy Statement, but does not indicate what could be "extraordinary and compelling" circumstances that are not in the Policy Statement; the Court also has not thought of other categories. For example, in this case, Gonzales is effectively trying to fit into the "medical condition of the defendant" category of the Policy Statement. In sum, if the Court were writing on a clean slate, which it is not, because of McGee, it would conclude that the Policy Statement does not bind district courts and the courts are free under Kimbrough v. United States to ignore it, but that it is still something that federal courts should read and consider when they get one of these compassionate release motions. While the Policy Statement does not limit the considerations that a district court can utilize to find "extraordinary and compelling" circumstances, and a court might go beyond the Policy Statement and create new categories, the federal courts should still be permitted to look at them if they wish. The Court is a district court and is not writing on a clean slate, however, and will follow faithfully the Tenth Circuit law and ignore the Policy Statement in ruling on Gonzales' motion for compassionate release.

Mamau, the Tenth Circuit's second published compassionate release case following the First Step Act, generates odd results contrary to Congress' intent, because it again directs courts to ignore the Policy Statement and also allows courts essentially to disregard mandatory minimums. In Maumau, it becomes evident that the three-step statutory analysis has now, in the Tenth Circuit, collapsed into a one-step judicial test. The Tenth Circuit concludes that district courts in carrying out § 3582(c)(1)(A), a three-part statute, possess the ability to determine for themselves what constitutes "extraordinary and compelling reasons," but, because it has decided there is no "applicable" Policy Statement, there do not appear to be any boundaries. The Tenth Circuit then says that the Commission -- neither now nor in the future -- can take away that discretion. The Tenth Circuit never explains how, if a district court has the "independent[]" authority to define the phrase, how its discretion could ever be "inconsistent" with a Policy Statement. Maumau, 993 F.3d at 832. The district courts are left to guess what this could mean in the future.

The Tenth Circuit spends a lot of time talking about the difference between "define" and "describe" which is interesting, but not very informative. Maumau, 993 F.3d at 832. The real question is what "extraordinary and compelling" means, and the Tenth Circuit does not attempt to tackle that issue. The Tenth Circuit's comparison of the Policy Statement to a "general statement of policy," Maumau, 993 F.3d at 833, rather than interpretive rules, is curious given that the Administrative Procedures Act, 5 U.S.C. §§ 551-50, does not apply to the Commission, see Mistretta v. United States, 488 U.S. 361, 390-92 (1989). In the end, the Tenth Circuit never says why a district court would ever act "inconsistent" with a Policy Statement. Moreover, if all the

Commission can do is "describe" what it thinks is "extraordinary and compelling," it is unclear why the Policy Statement does not fit the bill, and should not at least be considered if it is never even going to be binding. Maumau, 993 F.3d at 833.

It is one thing if the Tenth Circuit intends to say that the Guidelines do not bind district courts; since Kimbrough v. United States, 552 U.S. 85, no one could deny that a district court could disagree with the Commission's promulgations. At the same time, no one thought that courts or the Commission could ignore mandatory minimums unless Congress said mandatory minimums could be ignored. Instead, the Tenth Circuit finds in the words "extraordinary and compelling" the ability of district courts to get rid of mandatory minimums. Cf. Maumau, 993 F.3d at 837 ("Nothing in the district court's decision indicates that the district court granted relief to Maumau based upon its general disagreement with the mandatory sentences that are required to be imposed in connection with § 924(c) convictions."). There is nothing in Maumau that stops a district court from imposing the stated mandatory minimum one day, and then resentencing below the mandatory minimum the next day if the defendant files a compassionate release motion. The defendant in Mamau was released after serving ten years of a fifty-five-year sentence; he received, therefore, a sentence that was lower than both the mandatory minimums in place when he was sentenced and the mandatory minimums present in § 924(c)'s current iteration. See generally Teague v. Lane, 489 U.S. 288, 309 (1989)("Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.").

Respectfully, the Court doubts that is what Congress wanted when it used the words "extraordinary and compelling," which are used in the existing policy statement; neither the Commission nor Congress' use of these words suggest that district courts have the authority to have a Kimbrough disagreement with Congress and ignore mandatory minimums. See United States v. Tomes, 990 F.3d 500, 505 (6th Cir. 2021)("We will not render § 401(c) useless by using § 3582(c)(1)(A) as an end run around Congress's careful effort to limit the retroactivity of the First Step Act's reforms."). Minimums are not very mandatory if the resentencing court just can ignore them.

While the Tenth Circuit says that there is a three-step process in evaluating compassionate release applications, and states in Maumau that a district court must address all three steps if it intends to grant compassionate release, the Tenth Circuit again does not rely on or analyze § 3553(a) in its analysis, or indicate what the district court has to decide when it grants compassionate release. See Maumau, 999 F.3d at 830 n.3. There is, then, in effect, only one step regarding which the Tenth Circuit analyzes: "extraordinary and compelling," and the district court can decide that issue on its own. There is no applicable policy statement. The Tenth Circuit does not mention the § 3553(a) factors. Hence, the bellwether is the "extraordinary and compelling" reasons, and the district court has discretion to decide what constitutes "extraordinary and compelling." The Court is not convinced that Congress meant the Tenth Circuit's one-step, district court-by-court discretion to be the law. Although the United States Court of Appeals for the Seventh Circuit held that the Policy Statement was not "applicable," under the statute, it also stated:

[W]e do not see the absence of an applicable policy statement as creating a sort of Wild West in court, with every district judge having an idiosyncratic release policy.

The statute itself sets the standard: only "extraordinary and compelling reasons" justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive.

United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020). Even if the Tenth Circuit considers the Policy Statement inapplicable, it should, in the Court's view, allow district courts to consider the Policy Statement in their analysis. By implying in McGee and Maumau that district courts cannot consider the Policy Statement at all, the Tenth Circuit has created a situation in which "every district judge ha[s] an idiosyncratic release policy." United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020).

       With respect, it is difficult to reconcile the result in Maumau with the First Step Act, given that Congress has been clear when it wants certain programs to be retroactive and when it does not want others to be retroactive. The Honorable Timothy Tymkovich, Chief United States Circuit Judge for the Tenth Circuit, seems uncomfortable with the result, but does not shut the door to it. See Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring)("I write separately, however, to note that our holding does not give district courts carte blanche to retroactively apply in every instance the amendments to the stacking provision in 18 U.S.C. § 924(c). Congress, after all, chose *not* to make those amendments retroactive.")(emphasis in original). Chief Judge Tymkovich simply says that statutory changes to mandatory minimums cannot be the only reason for granting compassionate release. See Maumau, 993 F.3d at 838 (Tymkovich, C.J., concurring)(stating that "a district court may consider the legislative change to the stacking provision only in the context of an individualized review of a movant's circumstances"). The problem is not the number of reasons a court considers; the problem is how judges' reasons should not be able to overcome Congress' mandatory minimums. Chief Judge suggests that more pages of analysis can justify what is going on in the opinions the Honorable Mary Beck Briscoe, United States Circuit Judge for the Tenth Circuit, authored for the Tenth Circuit in McGee and Maumau. Disagreement with Congressionally imposed mandatory minimums, however, in the Court's view, should not be a factor at all in a court's compassionate release analysis.

       Last, it concerns the Court that the Tenth Circuit purports to apply an abuse-of-discretion standard in compassionate release cases, but has reversed a third of the compassionate release denials it has addressed on the merits. The Tenth Circuit, in 2019, reversed district courts on 7.1% of criminal cases and 7.5% of "U.S. Prisoner Petitions." Practitioner's Guide to the United States Court of Appeals for the Tenth Circuit at 9, Office of the Clerk, United States Court of Appeals for the Tenth Circuit (Jan. 1, 2020)(11th ed.), https://www.ca10.uscourts.gov/sites/default/files/clerk/2021PracGuideUpdate-11thEdition.pdf. See Just the Facts: U.S. Courts of Appeals, United States Courts (Dec. 20, 2016), https://www.uscourts.gov/news/2016/12/20/just-facts-us-courts-appeals#table2 (noting that nationwide, between 2011 and 2015, Courts of Appeals reversed between 5.8% and 6.9% of criminal cases and between 3.2% and 7.6% of "prisoner petitions"). The Tenth Circuit insists that it "review[s] for an abuse-of-discretion" in compassionate release cases. United States v. Pinson,

835 F. App'x 390, 393 (10th Cir. 2020). The Tenth Circuit describes this standard as a "deferential standard," and insists that it "will uphold the district court's ruling unless it relied on an incorrect conclusion of law or a clearly erroneous finding of fact." United States v. Pinson, 835 F. App'x at 394. Yet, of the twelve compassionate release denials that the Tenth Circuit has reviewed on the merits since the First Step Act's passage, it has reversed district courts on four occasions. See United States v. Avalos, No. 20-3194, 2021 WL 1921847 (10th Cir. May 13, 2021)(Briscoe, J.)(reversing district court's denial of compassionate release motion); United States v. McRae, 845 F. App'x 804 (10th Cir. 2021)(Holmes, J.)(reversing district court's denial of pro se compassionate release motion); United States v. Carr, No. 20-1152, 2021 WL 1400705 (10th Cir. Apr. 14, 2021)(Tymkovich, C.J.)(reversing district court's compassionate release denial because it applied the USSG policy statement); McGee, 992 F.3d at 1035 (Briscoe, J.)(reversing district court's denial of compassionate release motion). The Tenth Circuit has also affirmed district courts' compassionate release denials where the defendant did not exhaust administrative remedies, see United States v. Springer, 820 F. App'x 788, 792 (10th Cir. 2020)(Philips, J.)(affirming district court's denial of compassionate release motion where defendant had not complied with exhaustion requirement); United States v. Gieswein, 832 F. App'x 576 (10th Cir. 2021)(Kelly, J.)(affirming district court's denial of compassionate release motion where defendant had not complied with exhaustion requirement); United States v. Johnson, No. 20-6103, 2021 WL 1053706, at *2 (10th Cir. March 19, 2021)(McHugh, J.)("Because she has failed to demonstrate that she satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement, the district court properly rejected her request for relief under the statute."), or did not timely file an appeal, see United States v. Lara, No. 20-6133, 2020 WL 8729680, at *2 (10th Cir. Oct. 1, 2020)(Hartz, J.)(dismissing appeal of district court's denial of compassionate release motion because the defendant did not timely appeal). By contrast, the Tenth Circuit, thus far, has not reversed a district court's grant of compassionate release. See Maumau, 993 F.3d at 821 (affirming district court's grant of compassionate release motion). This undermines judicial efficiency, and is problematic for district judges who are not excited about resentencing all the people they have sentenced already. See Teague v. Lane, 489 U.S. 288, 309 (1989)("Without finality, the criminal law is deprived of much of its deterrent effect.").

This is a treacherous area for district judges. The Tenth Circuit does not appear to apply a true abuse-of-discretion standard to compassionate release denials. Although the Court has no specific statistics upon which to rely, given that the abuse-of-discretion standard is the most deferential standard of review, the Court presumes that the Tenth Circuit's reversal rate is likely -- or should be -- lower than its reversal rate averages. See Practitioner's Guide to the United States Court of Appeals for the Tenth Circuit at 9. Yet, when the district court denies a compassionate release motion where the defendant has exhausted his or her administrative remedies -- which, according to § 3582, it should grant only in extraordinary and compelling circumstances -- it faces a reversal rate of nearly five times the Tenth Circuit's average reversal rate. Cf. United States v. Pinson, 835 F. App'x at 394. Compounding the problem, the Tenth Circuit has spent a considerable amount of time telling district courts what they cannot consider when granting compassionate release motions, and little to no time explaining what extraordinary and compelling circumstances are, or how district courts should apply § 3553(a). See Maumau, 993 F.3d at 832; McGee, 992 F.3d at 1044. The Tenth Circuit instructs repeatedly that district courts have "discretion . . . to independently determine the existence of 'extraordinary and compelling

United States v. Carr, No. 20-1152, 2021 WL 1400705, at *4 (10th Cir. Apr. 14, 2021)(reversing a district court where the district court relied on the policy statement because, "[a]lthough it was within the district court's discretion to conclude the application notes to U.S.S.G. § 1B1.13 still provided the best definition and description of extraordinary and compelling reasons under the circumstances," it was "not apparent the district court recognized U.S.S.G. § 1B1.13 was no longer controlling"). The Court, therefore, addresses only the compassionate release test's first and third elements of the compassionate release test when it analyzes motions defendants bring directly. Similarly, as a result of the Tenth Circuit's holdings in McGee and Maumau, the Court determines whether a defendant's case presents extraordinary and compelling circumstances without relying on policy statements from the Sentencing Commission.

   3.    **It Is Difficult for a District Court to Evaluate Accurately Medical Requests for Compassionate Release Absent Expert Testimony.**

   It is very difficult for the Court to decide: (i) whether the BOP's medical care has been poor; and (ii) whether that poor care has compromised the defendant's prospects of survival in a compassionate release case. Normally, poor medical care in prison is dealt with in civil cases, and not in criminal cases. See Ramos v. Martinez, No. CIV 17-0120 JB/GBW, 2019 WL 7049620, at *3 (D.N.M. Dec. 23, 2019)(Browning, J.)("Deliberate indifference to serious medical needs of

---

reasons' . . . ." Maumau, 993 F.3d at 832. Accord McGee, 992 F.3d at 1044 (same). Respectfully, based on the reversal rates, however, this discretion, particularly where district judges deny compassionate release applications, appears more limited than the text of the Tenth Circuit's opinions indicate. In sum, the Tenth Circuit's lack of clear guidance, the high volume of compassionate release applications, and the Tenth Circuit's willingness to reverse district courts applying an already vague standard, reduces judicial efficiency and has created a minefield for district judges considering compassionate release applications.

prisoners constitutes the unnecessary and wanton infliction of pain that the Eighth Amendment proscribes."). Typically, the courts do not deal with medical care in the criminal context, but wait for a <u>Bivens</u> action under the Eighth Amendment. See, e.g., <u>Carlson v. Greene</u>, 446 U.S. 14, 20 (1980); <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976); <u>Richardson v. Daniels</u>, 557 F. App'x 725, 728 (10th Cir. 2014)(affirming dismissal of a prisoner's <u>Bivens</u> claim which alleged that the defendants "violated his Eighth Amendment rights in connection with their response to a seizure he had," where "corrections officers responded to his seizure, he received prompt medical attention and has been given medicine to treat seizures"). The efficient solution to poor medical care in a prison setting is neither to redo a sentence nor to release the defendant. It seems strange that we do not deal with medical protection in the criminal case unless it jeopardizes the defendant's right to effective assistance of counsel, see <u>United States v. Boigegrain</u>, 155 F.3d 1181, 1186 (10th Cir. 1998)("[I]t was impossible for the district court to allow the defendant to waive counsel before determining whether he was competent to stand trial,"), but, once a defendant goes to prison, courts may use poor medical care to release a defendant, see, e.g., <u>United States v. Beck</u>, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019)(Eagles, J.)(granting a prisoner's compassionate release motion "given her breast cancer and the poor treatment she has received at BOP"). Instead, <u>Bivens</u> actions are a more suitable remedy to problems with prison medical care, rather than compassionate release motions.

Moreover, it is difficult for a district court to compare medical care. Often, a defendant, when released, has no medical insurance, and his or her care is problematic. It is not clear how the Court should compare the care in a medical BOP Facility with care on the outside, particularly where the Court must speculate regarding the quality of medical a defendant might receive once released. Further, it is very difficult for a district court to know, without the discovery and experts

it has in a civil case, whether the defendant is the problem or whether the facility is the problem. See generally Nicholson v. Evangelical Lutheran Good Samaritan Soc'y, Inc., No. CV 16-0164 JB/KK, 2017 WL 3127799, at *29 (D.N.M. July 21, 2017)(Browning, J.)(stating that, in a medical malpractice case, the plaintiff must "use expert medical testimony," because, where "the cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion,' a plaintiff must introduce expert medical testimony that establishes causation")(quoting Woods v. Brumlop, 1962-NMSC-133, ¶ 15, 377 P.2d 520, 523 and citing O'Banion v. Owens Corning Fiberglass Corp., 968 F.2d 1011, 1013 (10th Cir. 1992)(affirming an order that excluded evidence of cancer where plaintiff presented no evidence "from a qualified medical expert stating that there is a reasonable medical probability the Plaintiff will have a cancer condition from his asbestos related disease"). The Court should proceed with caution when it encounters the thin record that often exists after criminal cases. Tossing a stack of medical records at the Court is not very helpful without expert testimony and a true adversarial process. On this basis, the Court cannot evaluate meaningfully whether the defendant has asked properly for help, whether the facility has denied improperly that care, and how severe the health condition is. Unless the parties are willing to wade deep and present the Court with a robust evidentiary record, the Court is left with the uneasy feeling that it is dealing with a pro se prisoner's complaint that is often seen in Bivens actions -- skeptical that the situation is as bad as the pro se prisoner says it is.

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory. 543 U.S. at 261. In excising the two sections, the Supreme Court left the remainder of the Sentencing

Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth

Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . ." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[14]

_____

[14]Attorneys and courts often say that the Guidelines are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory. See Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir.

2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); <u>United States v. Sells</u>, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, <u>see Gall v. United States</u>, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, <u>see Gall v. United States</u>, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. <u>See United States v. Sierra-Castillo</u>, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-<u>Booker</u> have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). <u>Accord United States v. Chavez-Rodarte</u>, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

    The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

    The Supreme Court held in <u>United States v. Booker</u> that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007), that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their <u>United States v. Booker</u>-granted authority to post-Guidelines analysis "variances." <u>Irizarry v. United States</u>, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. <u>See Gall v. United States</u>, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the

Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.  Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).  The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has concluded that, in an illegal re-entry case, the defendant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.  See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).

## ANALYSIS

"A federal court generally 'may not modify a term of imprisonment once it has been imposed.'"  Dillon v. United States, 560 U.S. at 819 (quoting 18 U.S.C. § 3582(c)). In 2018, Congress updated the compassionate release statute to allow courts to reduce a sentence for

---

chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

"extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A). For over thirty years, under the original statute, only the BOP Director could file a § 3582(c)(1)(A) motion for a sentence reduction on a defendant's behalf. See United States v. Smartt, 129 F.3d at 541. Today, defendants themselves may also seek a reduction directly from the court, provided that: (i) the defendant first seeks a reduction from the BOP; and (ii) that request has either (a) been denied; or (b) thirty days have passed since the original request. See 18 U.S.C. § 3582(c)(1)(A).

After an applicant for compassionate release exhausts his or her administrative remedies, the defendant must then satisfy the tripartite test for analyzing compassionate release motions. See McGee, 992 F.3d at 1043 ("Because this three-step test is consistent with the plain language of the statute, we adopt the [Sixth Circuit's] test for use in this circuit.")(citing United States v. Jones, 980 F.3d at 1107-08). First, the Court "must 'find[]' whether 'extraordinary and compelling reasons warrant' a sentence reduction." United States v. Jones, 980 F.3d at 1107-08 (alterations in original)(quoting 18 U.S.C. § 3582(c)(1)(A)(i)). Second, the Court determines whether a sentence reduction is consistent with U.S.S.G. § 1B1.13, where applicable. See United States v. Jones, 980 F.3d at 1108. U.S.S.G. § 1B1.13 is inapplicable, however, "where an imprisoned person files a motion for compassionate release." United States v. Jones, 980 F.3d at 1108. Third, the Court considers "the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). See United States v. Jones, 980 F.3d at 1108. "'[D]istrict courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others.'" McGee, 992 F.3d at 1035, at *6 (quoting United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021)).

Gonzales does not qualify for compassionate release, because his case does not present extraordinary and compelling circumstances, and releasing him from prison would not serve

§ 3553(a)'s purposes.  See McGee, 992 F.3d at 1048.  First, as a threshold matter, Gonzales exhausted his administrative remedies, because he filed a request for compassionate release with the FCI Danbury Warden, and the Warden denied his request.  See Inmate Request to Staff (dated April 30, 2020), filed June 1, 2020 (Doc. 138-1); Response to Inmate Request to Staff Member (dated May 8, 2020), filed June 1, 2020 (Doc. 138-2).  Second, Gonzales' case does not present extraordinary and compelling circumstances; because, although the BOP's neglect of Gonzales' many medical conditions has caused multiple hospitalizations for sepsis, which created a serious risk of death for Gonzales, the BOP is capable of treating Gonzales' medical conditions, and the Court declines to speculate whether Gonzales would receive better medical care in Abiquiu, a remote area of New Mexico.  Cf. United States v. Beck, 425 F. Supp. 3d 573, 580-81 (M.D.N.C. 2019)(Eagles, J.)("Absent judicial oversight, [the defendant] is unlikely to receive better treatment at [the BOP Facility] going forward.").  The third factor is neutral, because there is no applicable Sentencing Commission policy statement, given that Gonzales filed the Motion on his own behalf.  See McGee, 992 F.3d at 1050.  Last, the § 3553(a) factors do not support Gonzales' compassionate release, because, although Gonzales has undertaken significant rehabilitation efforts in prison, Gonzales' crime was very serious, and the sentence the Court imposed previously is necessary to reflect the offense's seriousness, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public.  See 18 U.S.C. § 3553(a); MOO, 163 F. Supp. 3d at 1133.  Consequently, the Court concludes that Gonzales does not qualify for compassionate release pursuant to § 3582(c)(1)(A).

I.    **THE COURT HAS JURISDICTION OVER THIS CASE, BECAUSE GONZALES HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES.**

The Court may consider a motion for compassionate release by a defendant where "the

defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). See United States v. Johnson, No. 20-6103, 2021 WL 1053706, at *2 (10th Cir. March 19, 2021)("In this circuit, however, § 3582(c)(1)(A)'s exhaustion requirement is mandatory, rather than judicially waivable."). Here, Gonzales' mother and stepfather requested compassionate release on Gonzales' behalf from the Warden on April 16, 2020. See Roger and Pamela Inman Email at 31-32 (dated April 16, 2020), filed May 18, 2020 (Doc. 136). Gonzales also filed a request for compassionate release with the Warden on April 30, 2020. See Motion at 10.[15] Noting his asthma and obesity, Gonzales asked the Warden for compassionate release "due to my being high risk according to the CDC for COVID-19." Inmate Request to Staff at 1. The Warden responded, explaining that Gonzales' "concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence." Response to Inmate Request to Staff Member at 1. Because the Warden did not grant Gonzales' compassionate release request, he has exhausted his administrative remedies under the statute. See 18 U.S.C. § 3582(c)(1)(A).[16] Moreover, the United States and Gonzales both agree that he "has

---

[15]In the Motion, Gonzales also asserts that he also "requested compassionate release from the Danbury warden several times beginning on March 23 (an 'inmate request to staff' form BP-A0148, informally known as a 'cop out'), . . . April 20 (Tru-Links email request from Mr. Gonzales to the warden)." The Court has not received copies of these requests.

[16]The administrative exhaustion requirement in the First Step Act does little to assist the district judges with this burden. A defendant need only file a one-page document with the Warden of his or her prison requesting release. See 18 U.S.C. 3581(c)(1). If the Warden does not respond within thirty days, the defendant may file suit in district court. Where the Warden issues a denial, the Warden typically does not provide detailed reasons for this denial. See, e.g., Response to Inmate Request to Staff Member at 1 (informing Gonzales that "concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from

exhausted his administrative remedies." Response at 1. See Motion at 10-11. The Court, therefore, has jurisdiction over this case, because Gonzales has exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A).

## II. GONZALES HAS NOT DEMONSTRATED EXTRAORDINARY AND COMPELLING CIRCUMSTANCES UNDER § 3582(c)(1)(A)(i), BECAUSE COVID-19 ALONE DOES NOT SATISFY THE STANDARD AND THE BOP CAN MANAGE PROPERLY GONZALES' CARE.

The Court derives its test for extraordinary and compelling circumstances from the words' dictionary definitions. Black's Law Dictionary provides the following relevant definition for extraordinary: "Beyond what is usual, customary, regular, or common." Extraordinary, Black's Law Dictionary (11th ed. 2019). The New Oxford American Dictionary defines similarly extraordinary as "very unusual or remarkable." New Oxford American Dictionary 614 (3d ed. 2010). It defines compelling as "evoking interest, attention, or admiration in a powerfully

---

your sentence"). Again, if the Warden denies the request, this enables the defendant to file in district court. The Court is left with an administrative record that is around two pages at most, and acts only to demonstrate that the defendant followed the statute's exhaustion prescription. See 18 U.S.C. 3581(c)(1). The administrative review process, therefore, does nothing, or almost nothing, to develop the factual record before a case reaches the Court. The case invariably will reach the Court, because the BOP either ignores or denies virtually all compassionate release requests. See Reductions in Sentence Requests March through May 2020, the Marshall Project, https://www.themarshallproject.org/documents/7217918-Reduction-in-Sentence-Requests-March-Through-May (last visited May 31, 2021)(providing data from the BOP demonstrating that between March, 2020, and May, 2020, the BOP denied ninety-eight percent of compassionate release requests). Accordingly, the administrative exhaustion process in compassionate release cases is essentially useless. Moreover, the briefing the Court receives from the United States is often copy and pasted from one brief to the next, although the Court is supposed to consider each defendant's individualized circumstances. See Response at 11. This lack of help from the BOP and the United States further exacerbates the burden on the Court. A more robust administrative review process, before an administrative law judge, as well as individualized briefing by both parties that discusses the case's circumstances in detail, would assist the Court in dealing with its crush of criminal cases, which has expanded recently as a result of compassionate release motions.

irresistible way; not able to be refuted, inspiring conviction; not able to be resisted, overwhelming." New Oxford American Dictionary 353 (3d ed. 2010). Here, the Court finds that Gonzales suffers from relatively common health problems -- the health problems themselves are not "very unusual." New Oxford American Dictionary 614 (3d ed. 2010). See, e.g., S.M. Ellis Simonsen et al., Cellulitis Incidence in a Defined Population, 134 Epidemiology & Infection 293-99 (2006); Jaspal Singh, Basics of Sleep Apnea, American College of Cardiology (Jan, 8, 2013), https://www.acc.org/latest-in-cardiology/articles/2014/07/22/08/25/basics-of-central-sleep-apnea ; Craig M. Hales et al., Prevalence of Obesity and Severe Obesity Among Adults: United States, 2017-18, Centers for Disease Control and Prevention (Feb. 2020), https://www.cdc.gov/nchs/products/databriefs/db360.htm (stating that "the age-adjusted prevalence of severe obesity in adults was 9.2% and was higher in women than men"). Gonzales is not a healthy man, but considering his weight and infirmities, he is not going to be healthy even if released from prison. Gonzales is incarcerated in a level three care facility, which is designed for "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." Care Level Classification at 5. Level three care facilities should be equipped to treat the following "example conditions: cancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, . . . congestive heart failure, and end-stage liver disease." Care Level Classification at 5. Moreover, FCI Danbury is located near Danbury Hospital, where Gonzales has been hospitalized previously and where he admits he "has received adequate care . . . ." See Tr. at 26:5-13 (Court, Converse). FCI Danbury, therefore, is capable of treating appropriately Gonzales' common medical conditions. The solution to Gonzales' medical complaints is for the BOP to provide Gonzales with adequate care.

Gonzales' proposition that he should be released, therefore, is not irrefutable, see New Oxford American Dictionary 353 (3d ed. 2010), because less intrusive relief is available, see generally 18 U.S.C. § 3626(a)(3)(A)(explaining that "in any civil action with respect to prison conditions, no court shall enter a prisoner release order unless a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the federal right . . . .").  In sum, because FCI Danbury, where Gonzales is housed, is equipped to treat "complex, and usually chronic, medical or mental health conditions," Care Level Classification at 5, the BOP is capable of treating Gonzales' relatively common health problems, the Court concludes that Gonzales' situation does not contain extraordinary and compelling circumstances warranting his release.

### A. GONZALES' CASE DOES NOT EXHIBIT EXTRAORDINARY AND COMPELLING CIRCUMSTANCES ON THE BASIS OF HIS SUSCEPTIBILITY TO COVID-19.

"[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." United States v. Raia, 954 F.3d 954, 597 (3d Cir. 2020).  The United States has made a blanket concession that, where an individual is incarcerated and has a condition that the CDC asserts creates a heightened risk of COVID-19 complications (a "listed condition"), that person presents extraordinary and compelling circumstances under § 3582(c)(1)(A)(i).  See Response at 3.  As a result, other than noting that Gonzales has been diagnosed with a listed condition, the United States has not presented argument regarding the extraordinary and compelling circumstances prong of the compassionate release test. See Response at 1-16.  The Court is disappointed in the United States' blanket concession.  The United States should, as the Court must, evaluate each case on an individualized basis.  In this case, the Court disagrees with the United States and Gonzales that his risk of contracting COVID-19 constitutes an extraordinary and compelling circumstance, because his current risk level is not

particularly high. Gonzales either has been offered, or soon will be offered, the COVID-19 vaccine. See Dave Collins, Inmates Refuse Inoculations; New Vaccine Arrives in State, Associated Press (March 3, 2021), https://apnews.com/article/connecticut-danbury-prisons-coronavirus-pandemic-hartford-0 49f5b96c5f78ed0c61a745c6f65fcfc (noting that "nearly 550 of the approximately 800 inmates at" Danbury FCI "have been offered a COVID-19 vaccine" as of March 3, 2021). Moreover, as of May 29, 2021, the BOP has 129,278 inmates and has administered 185,684 does of the COVID-19. See Covid-19, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 29, 2021). Even if Gonzales has not yet received the vaccine, Gonzales' risk of contracting COVID-19 has decreased significantly since he filed this Motion, in part because Gonzales contracted COVID-19 already. See United States v. Read-Forbes, 843 F. App'x 131, 134 (10th Cir. 2021)(dismissing a compassionate release appeal as moot where the defendant had contracted COVID-19 already, because "the courts can no longer do anything to prevent her from getting her initial infection"); Reinfection with COVID-19, Centers for Disease Control and Prevention (Oct. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html [https://perma.cc/W54E-WTZ3] (noting that, although "cases of reinfection with COVID-19 have been reported," they "remain rare").

**B. ALTHOUGH THE COURT IS VERY CONCERNED ABOUT THE BOP'S REPEATED NEGLECT OF GONZALES' MEDICAL CONDITIONS, THE COURT CONCLUDES THAT GONZALES' CASE DOES NOT PRESENT EXTRAORDINARY AND COMPELLING CIRCUMSTANCES, BECAUSE THE BOP IS CAPABLE OF MANAGING GONZALES' RELATIVELY COMMON HEALTH PROBLEMS.**

Gonzales' significant medical problems, and the BOP's repeated treatment delays, even throughout the course of this litigation, present the Court with far greater concern than Gonzales'

risk of COVID-19 exposure. Since the First Step Act's passage in 2018, the majority of compassionate release cases have focused primarily on the COVID-19 pandemic and prisoners' susceptibility to the virus. See, e.g., United States v. Baca, 2020 WL 5369078, at *14 (discussing COVID-19 in conjunction with other risk factor such as Hepatitis C or liver disease); United States v. Lopez, 487 F. Supp. 3d 1156 (D.N.M. 2020)(Vázquez, J.); United States v. Agomuoh, 461 F. Supp. 3d 626, 636 (E.D. Mich. 2020)(Levy, J.)("The current conditions of Defendant's confinement at FCI Morgantown, which Defendant has no power to alter, expose him to a substantial risk of contracting COVID-19.").

A significant category of compassionate release cases has also emerged where a defendant alleges that the BOP has been indifferent to or neglected seriously his or her medical needs. See, e.g., United States v. Beck, 425 F. Supp. 3d at 580-81 (concluding that, where the BOP delayed significantly in providing medical care to an inmate with breast cancer that risked "potential loss of her life," the delays comprised extraordinary and compelling circumstances); United States v. York, No. CR 11-0076, 2019 WL 3241166, at *2 (E.D. Tenn. July 18, 2019)(Phillips, J.)(holding that a defendant had demonstrated extraordinary and compelling circumstances where the defendant alleged that "medical recommendations by outside specialists are being ignored by the" BOP, "the facility is ill-equipped to handle his medical issues, and he has tolerated an ill-fitted wheelchair because the BOP states that they are unable to provide one to fit his size"). The Court concludes that the BOP's treatment of Gonzales, while concerning, does not present extraordinary and compelling circumstances, because the BOP is capable of providing Gonzales with adequate care. See United States v. Rodriguez, 424 F. Supp. 3d 674, 683 (N.D. Cal. 2019)(Orrick, J.)(noting that, although "the BOP mishandled Rodriguez' case in extraordinary way, repeatedly neglecting to provide him with the services he needs . . . there is no compelling reason to resentence" the

defendant because the BOP was capable of providing the needed care); White v. United States, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019)(Harpool, J.)(noting its concerns about the defendant's health conditions and stating that, if the defendant's conditions worsen , "the Court expects the BOP to transfer Petitioner to a facility where his medical needs can be met and notes that the BOP houses many inmates in its medical facilities who are legally blind or relegated to wheelchairs," but denying compassionate release, and explaining that "compassionate release due to a medical condition is an extraordinary and rare event"); United States v. Israel, No. 05 CR 1039 (CM), 2019 WL 6702522, at *9 (S.D.N.Y. Dec. 9, 2019)(denying a defendant's compassionate release motion because, although the defendant "suffers from severe, debilitating, progressive and permanent medical conditions," the defendant had committed "extremely serious crimes," and "reducing Israel's sentence would not reflect the seriousness of his crimes, provide just punishment, or promote respect for the law"). The Court will recommend, however, the USPO to file a report with the Court by July 1, 2021, describing whether the BOP is treating adequately Gonzales' health problems, because: (i) BOP's current neglect of Gonzales' medical conditions creates a serious risk of death for Gonzales where the BOP has delayed repeatedly Gonzales' medical care and without proper treatment, Gonzales' health problems will likely worsen; (ii) in the eleven months since Gonzales filed the Motion, the BOP has done nothing to reassure the Court that it will provide Gonzales with adequate medical care; and (iii) FCI Danbury's continued and historical neglect of inmates' healthcare is disturbing.

The BOP's current neglect of Gonzales' medical conditions, however, creates a serious risk of death for Gonzales. See United States v. Rodriguez, 424 F. Supp. 3d at 683; Motion at 3. Gonzales' diagnosed conditions include morbid obesity, severe asthma, deep vein thrombosis, peripheral vascular disease, obstructive sleep apnea, leukocytosis, cellulitis, COVID-19, and

sepsis.  See Motion at 3.  Gonzales also has yet to receive a diagnosis or care for a knee injury he

experienced after a fall in early 2020.  See Second Supp. at 2-3.  Additionally, since August, 2020,

Gonzales has suffered from a severe rash and bruising that covers most of his body.  See Sixth

Supp. at 7.  Gonzales' repeated sepsis cases present a particularly high risk to Gonzales' life.  See

Chanu Rhee & Michael Klompas, Sepsis Trends: Increasing Incidence and Decreasing Mortality,

or Changing Denominator?, 12 J. Thoracic Disease 1, 6 (2020).  Data on sepsis mortality rates

varies, but mortality rates tend to hover between twenty and thirty percent.  See Chanu Rhee &

Michael Klompas, Sepsis Trends: Increasing Incidence and Decreasing Mortality, or Changing

Denominator?, 12 J. Thoracic Disease 1, 6 (2020)(explaining that "sepsis mortality rates decreased

from 1991 to 2000 but then increased from 26.6% in 2001-2005 to 29.2% in 2006-2009"); Mitchell

M. Levy, Antonio Artigas, Gary S. Phillips, Andrew Rhodes et al., Outcomes of the Surviving

Sepsis Campaign in Intensive Care Units in the USA and Europe: a Prospective Cohort Study, 12

Lancet Infectious Diseases 919 (2012)(estimating that the crude hospital mortality rate for sepsis

in the United States is 28.3%, while the adjusted mortality rate was 31.3%).  Skin infections, like

the cellulitis Gonzales has contracted repeatedly, or the untreated severe rash he is experiencing

currently, can result in sepsis when left untreated.  See Septicemia, Johns Hopkins Medicine,

https://www.hopkinsmedicine.org/health/conditions-and-diseases/septicemia (last visited April

12, 2021); Hsiu Nien Shen, Chin Li Lu, and Hsi Hsing Yang, Risk of Recurrence After Surviving

Severe Sepsis: A Matched Cohort Study, 46 European Respiratory J. 59 (2015)("Risk of

recurrence after surviving severe sepsis is substantial regardless of patient characteristics or

infection sites.").  Moreover, Gonzales' cellulitis led to his previous sepsis infections.  See Sept.

21 Patient History at 41.  The Court is concerned that, left untreated -- as it has been since August,

2020 -- Gonzales' severe rash, or another bout of cellulitis, could cause sepsis during Gonzales'

remaining sentence of approximately three years. Additionally, Gonzales' deep vein thrombosis also increases his risk of death. See Linda E Flitnerman, Astrid van Hylckama Vlieg, Suzanne C. Cannegieter, and Frits R. Rosendaal, Long-Term Survival in a Large Cohort of Patients with Venous Thrombosis: Incidence and Predictors, 9 PLoS Medicine 1 (2012)(explaining that "patients who experienced a first venous thrombosis had an increased risk of death which lasted up to 8 years after the event," amounting to quadruple the "risk of death compared with control" patients.

The BOP's poor medical care has also compromised Gonzales' future "prospects for survival." United States v. Beck, 425 F. Supp. 3d at 573. Gonzales' health has worsened progressively since he entered prison in 2016. See Motion at 3. When Gonzales began his prison term in 2016, he had been diagnosed with obesity and asthma. See Motion at 3. Since being in prison, Gonzales has been diagnosed with deep vein thrombosis, peripheral vascular disease, obstructive sleep apnea, leukocytosis, cellulitis, COVID-19, and sepsis. See Sixth Supp. at 7; July 1 Clinical Notes at 10; July 20 Clinical Notes at 4-5. The BOP's neglect of conditions like Gonzales' cellulitis have resulted in higher risk conditions, like his sepsis. Moreover, Gonzales' constellation of health conditions, particularly his recurrent sepsis, indicate that, when the BOP neglects Gonzales' health, they place him at serious risk of death. See United States v. Beck, 425 F. Supp. at 580-81. Following his COVID-19 infection, Gonzales' asthma has worsened; he has reported coughing up blood and a severe burning pain in his lungs. See March 31 Hospital Records at 8-15. Gonzales experiences currently significant pain as a result of his medical conditions, see United States v. Carter, 2020 WL 6515956, at *2. During a June 1, 2020, visit with prison healthcare providers, Gonzales reported experiencing pain at a nine out of ten. See June 1 Clinical Notes at 2. Gonzales' untreated rash, which "cover[s] most of his body -- with open sores that are

weeping pus and soaking his clothes," Sixth Supp. at 7, and the resultant pain and itching are "so severe they keep him from sleeping at night," Third Supp. at 1. The Court finds, by a preponderance of the evidence that, "without proper treatment," Gonzales' health problems will "continue to get worse and his ability to provide self-care will progressively diminish." United States v. Carter, 2020 WL 6515956, at *2. See United States v. Gasich, 2019 WL 4261614, at *2.

The BOP has delayed repeatedly Gonzales' medical care. See Brief at 15; Reply at 7. For example, Gonzales was twice hospitalized with COVID-19 complications and the hospital prescribed him medications to alleviate his symptoms, which included shortness of breath, coughing up blood, and a severe burning pain in his lungs which exacerbated his pre-existing asthma. See March 31 Hospital Records at 9-15 (describing Gonzales' symptoms as "concerning"). After he was discharged from the hospital, however, Gonzales' prescription "was not even ordered until ten days after his second discharge," and he received it two weeks after his discharge. Brief at 15. See Reply at 7. Gonzales' requests for care also "have been specifically denied." United States v. Shmuckler, 2019 WL 6257959, at *3. Gonzales reported to the BOP provider that his "bilateral legs are bothering him and throbbing" on July 1, 2020. See July 1 Clinical Notes at 10. Despite Gonzales' history of cellulitis in his legs, the BOP took no action to treat this. See July 1 Clinical Notes at 10. Gonzales' ongoing knee injury also has not been treated.

Moreover, since Gonzales filed this case, the BOP has neither improved the care with which it provides Gonzales, nor promised the Court that it will somehow improve the care. See United States v. Rodriguez, 424 F. Supp. 3d at 683; United States v. Rivernider, 2019 WL 3816671, at *3. In United States v. Rodriguez, the Honorable William H. Orrick, United States District Judge for the United States District Court for the North District of California, considered

a defendant's motion for compassionate release, noting that he was "disturbed" by the "BOP's mind-boggling conduct . . . and the BOP's demonstrated inability or unwillingness to provide him with the physical therapy and medical care that he needs." 424 F. Supp. 3d at 675. Nonetheless, Judge Orrick denied the motion, because the defendant was transferred "to a nearby Residential Reentry Center ('RRC') . . . , where the government has promised that he will receive the services he has been requesting . . . ." 424 F. Supp. 3d at 675. Judge Orrick cautioned, however, that "should the representations regarding services at the RRC prove untrue, I may sua sponte grant the requested relief." 424 F. Supp. 3d at 676. Judge Orrick also directed the USPO to file a written report a week after the defendant's admission to the RRC "informing me and the parties whether the RRC is providing the promised services," and scheduled a status conference for two weeks after the defendant's RRC admission "to ensure that Rodriguez is receiving the services he needs" and "review compliance" 424 F. Supp. 3d at 676; id. at 683. Similarly, in United States v. Rivernider, the Honorable Robert N. Chatigny, United States District Judge for the United States District Court for the District of Connecticut, noted that "[t]he defendant's concern about the quality of medical care provided to him" following a bypass surgery "is not unfounded." United States v. Rivernider, 2019 WL 3816671, at *3. Judge Chatigny denied the defendant's compassionate release motion, however, because "[s]ince the motion was filed . . . these lapses have been corrected." United States v. Rivernider, 2019 WL 3816671, at *3.

Here, in the eleven months since Gonzales filed the Motion, the BOP has done nothing to reassure the Court that it will provide Gonzales with adequate medical care. Gonzales, however, has submitted six supplements updating the Court regarding the inadequate medical care he has been receiving. See Brief at 1; Second Supp. at 1; Third Supp. at 1; Fourth Supp at 1; Sixth Supp. at 1; Seventh Supp. at 1. Gonzales' medical care has not improved; his supplements have identified

continued delays in care.  See Brief at 1; Second Supp. at 1; Third Supp. at 1; Fourth Supp at 1; Sixth Supp. at 1; Seventh Supp. at 1.  Gonzales admits, however, that he has received good care at the Danbury Hospital.  See Tr. at 26:5-13 (Court, Converse)(agreeing that Gonzales "has received adequate care at the Danbury Hospital").  Moreover, Gonzales' conditions are all relatively common, and Gonzales has not shown that the BOP cannot provide the care he needs, only that the BOP is either delaying or neglecting to provide the care he needs.  See, e.g., S.M. Ellis Simonsen et al., Cellulitis Incidence in a Defined Population, 134 Epidemiology & Infection 293-99 (2006)(explaining that "cellulitis is a commonly occurring infection of the skin and subcutaneous tissues that can lead to life threatening complications"); Jaspal Singh, Basics of Sleep Apnea, American College of Cardiology (Jan, 8, 2013), https://www.acc.org/latest-in-cardiology/articles/2014/07/22/08/25/basics-of-central-sleep-apnea (stating that obstructive sleep apnea is "extremely common in the adult population").  The Court finds, therefore, by a preponderance of evidence, that Gonzales health condition are treatable by the BOP  if the BOP does not continually delay and deny Gonzales' care.  The Court also recommends and requests that the USPO to report on Gonzales' treatment status by July 1, 2021. See United States v. Rodriguez, 424 F. Supp. 3d at 676.

FCI Danbury's continued and historical neglect of inmates' healthcare is troublesome.  See United States v. Flores, 465 F. Supp. 3d at 252.  Regarding FCI Danbury, the Honorable David G. Larimer, United States District Judge for the Western District of New York, opined that "[t]he record of infection and the BOP's neglect to deal with it is disturbing."  United States v. Flores, 465 F. Supp. 3d 251, 252 (W.D.N.Y. 2020)(citing Martinez-Brooks v. Easter, 459 F. Supp. 3d 411 (D. Conn. 2020)(Shea, J.)(granting a temporary restraining order by the inmates of FCI Danbury against the Warden in May, 2020)).  Gonzales provides additional reports of instances where FCI

Danbury has neglected other inmates' medical needs.  See Sixth Supp. at 7.  For example, a pregnant female inmate "has yet to receive an ultrasound -- despite being 6 months along in the pregnancy.  She has been told by medical staff that she will not be receiving an ultrasound during the pregnancy." Sixth Supp. at 7.  In another case, an inmate had "has been experiencing blood in his stool since this summer." Sixth Supp. at 7.  A doctor "expressed concern that he may have colon cancer" in early October, 2020.  Sixth Supp. at 7.  In mid-November, 2020, the inmate "learned the procedure had still not been scheduled and may take another 90 days to be performed." Sixth Supp. at 7.  Moreover, Gonzales' own issues with obtaining adequate healthcare while incarcerated at FCI Danbury have been well documented.  See Brief at 1; Second Supp. at 1; Third Supp. at 1; Fourth Supp at 1; Sixth Supp. at 1; Seventh Supp. at 1.  Consequently, Gonzales' location at FCI Danbury concerns the Court.

Accordingly, the Court recommends and requests that the United States and, specifically, the BOP, to file a report with the Court by July 1, 2021, describing whether the BOP is treating adequately Gonzales' health problems.  If the BOP is not, Gonzales may, for example, bring an action under Bivens v. Six Unknown Agents, 403 U.S. 388 (1971), seek "an injunction, based on the federal courts' equity jurisdiction, to enforce the dictates of the Eighth Amendment," Simmat v. United States Bureau of Prisons, 413 F.3d 1225, 1231 (10th Cir. 2005)("Simmat"), or seek "mandamus" relief "under 28 U.S.C. § 1361," Simmat, 413 F.3d at 1231.[17]  See, e.g., 18 U.S.C. § 3626(a)(describing requirements for prisoners seeking prospective relief and preliminary injunctive relief); Martinez-Brooks v. Easter, 459 F. Supp. 3d at 414 (granting in part and denying

---

[17]Because this case is not before the Court, the Court will not opine whether such a case would be successful.  Moreover, because § 3582(c) gives the Court authority only to "modify a term of imprisonment," the Court cannot order directly the BOP to improve Gonzales' care as a result of the current litigation.

in part a temporary restraining order against the BOP's director and FCI Danbury's Warden where inmates alleged Eighth Amendment violations).  While certain health issues can rise to the level of extraordinary and compelling circumstances, see, e.g, United States v. Jackson, 2021 U.S. Dist. LEXIS 96110 (E.D. Ohio May 20, 2021)(Polster, J.)(concluding that a defendant's case presented extraordinary and compelling circumstances where "medical professionals have found Jackson's cancer to be 'malignant,' 'high grade,' and 'aggressive'" and "the best remaining medical option" for the defendant, after chemotherapy treatments "failed to eradicate the cancer" was a treatment "which the BOP does not provide), the courts should be slow to move all issues with BOP medical care to resentencing.  Here, without creating a bright line rule, it is sufficient for the Court to say that Gonzales' health problems are not extraordinary and compelling and, to be clear to the parties and the Tenth Circuit, that is all the Court is saying on the issue.

III.  **THE SENTENCING COMMISSION'S POLICY STATEMENTS ARE NOT APPLICABLE, BECAUSE GONZALES, RATHER THAN THE WARDEN, BROUGHT THE MOTION.**

In a compassionate release case, the Court assesses typically whether, under § 3582(c)(1)(A), Gonzales' release comports with the U.S.S.G.'s applicable policy statements. See McGee, 992 F.3d at 1045.  In general, these "guideposts" should "serve as part of the general policy statements to be considered by district courts under the second part of the statutory test in § 3582(c)(1)(A)."  McGee, 992 F.3d at 1045.  The Tenth Circuit explained in a recent opinion, however:

> Although Congress's enactment of the First Step Act and its amendment of § 3582(c)(1) should have prompted the Sentencing Commission to revise the policy statement set forth in § 1B1.13, the Sentencing Commission has, to date, been unable to do so.  The Sentencing Commission consists of seven voting members and, per statute, requires four members for a quorum to amend the guidelines. 28 U.S.C. §§ 991(a)(setting forth the number of members), 994(a)(requiring the vote of four members).  Since the First Step Act was enacted, the Commission has

had only two voting members. Thus, the Commission has been unable to comply with its statutory duty of promulgating a post-First Step Act policy statement regarding the appropriate use of the sentence reduction provisions of § 3582(c)(1)(A)(i).

The government argues that the Sentencing Commission's existing policy statement remains binding on district courts, even in cases where the defendant, rather than the Director of the BOP, has filed a motion for sentence reduction under § 3582(c)(1)(A). The problem with this position, however, is at least two-fold. First, it ignores the fact that the Sentencing Commission has failed to fulfill its statutory duty to issue a post-First Step Act policy statement recognizing the ability of defendants to file their own motions for sentence reductions. Second, and relatedly, it effectively undercuts the statutory changes that Congress made in the First Step Act when it authorized defendants to file their own motions. More specifically, treating the existing policy statement as continuing to be applicable would effectively eliminate, in all cases involving motions filed directly by defendants rather than the Director of the BOP, the "Other Reasons" (i.e., "catch-all") category that the Sentencing Commission clearly intended to exist. This is because the "catch-all" category, as described in the Sentencing Commission's existing policy statement, requires a determination by the Director of the BOP that extraordinary and compelling circumstances exist in a given case. But, in a case where the defendant has moved for relief under the statute, the Director of the BOP has necessarily *not* made any such determination. This is problematic and clearly undercuts not only Congress's intent to expand the use of compassionate release, but also the Sentencing Commission's intent to recognize a "catch-all" category of cases in addition to those that fall within the narrow confines of the first three categories of cases. Thus, we reject the government's position. See generally Dorsey v. United States, 567 U.S. 260, 266 . . . (2012)(noting that "federal sentencing statutes . . . interact[ ] with the Guidelines in an important way," and always "trump[ ] the Guidelines").

We conclude instead, as have the Second, Fourth, Sixth, and Seventh Circuits, that the Sentencing Commission's existing policy statement is applicable only to motions for sentence reductions filed by the Director of the BOP, and not to motions filed directly by defendants. See McCoy, 981 F.3d at 281; United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); Jones, 980 F.3d at 1109; United States v. Brooker, 976 F.3d 228, 236 (2d Cir. 2020). "In other words, if a compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13" would "not, by its own terms [be considered to] apply to it." Brooker, 976 F.3d at 236. "Because Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." Id.

McGee, 992 F.3d at 1050 (emphases in original)(footnotes omitted). Here, because

Gonzales -- rather than the Warden -- filed the Motion, "the Sentencing Commission's most recent policy statement, which was issued prior to the First Step Act, is not 'applicable' to [his] motion." McGee, 992 F.3d at 1050. See Motion at 1. Accordingly, because U.S.S.G. § 1B1.13 is inapplicable here,[18] the Court will not consider U.S.S.G. § 1B1.13 when deciding whether to grant Gonzales' Motion.

## IV. REDUCING GONZALES' SENTENCE IS NOT CONSISTENT WITH THE § 3553(A) FACTORS.

After examining the "extraordinary and compelling reasons," requirement the Court must then "consider[ ] the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(1)(A). Section 3553(a) provides:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --
>
> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    the need for the sentence imposed --
>
> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal

---

[18]The Court denied previously a motion for compassionate release, explaining that "[n]one of the advisory committee's notes to § 1B1.13's demarcated categories apply to Garduño." United States v. Baca, No. CR 16-1613 JB, 2020 WL 5369078, at *14 (D.N.M. Sept. 8, 2020)(Browning, J.). Since the Court's opinion in September, 2020, the Tenth Circuit authored McGee, which instructs the Court not to consider § 1B1.13. See 992 F.3d at 1050. The result in United States v. Baca, however, remains the same. That result is also justified, because, as the Court explained, "Garduño is not necessarily at elevated risk for COVID-19 complications and is not at risk of missing his mother's funeral, so the Court cannot justify soundly compassionate release on the bases of these circumstances." 2020 WL 5369078, at *15.

conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for --

(A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines --

(i)    issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii)    that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

. . . .

(5)    any pertinent policy statement --

(A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether

> such amendments have yet to be incorporated by the
> Sentencing Commission into amendments issued
> under section 994(p) of title 28); and
>
> (B)    that, except as provided in section 3742(g), is in
>        effect on the date the defendant is sentenced.
>
> (6)    the need to avoid unwarranted sentence disparities among
>        defendants with similar records who have been found guilty of
>        similar conduct; and
>
> (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Court evaluates these factors in the third step of assessing Gonzales'

motion for compassionate release, and concludes that they do not weigh in favor of Gonzales'

release.

A.    **THE COURT CRAFTED CAREFULLY GONZALES' SENTENCE IN 2016 AND APPLIED THE § 3553(A) FACTORS.**

When the Court sentenced Gonzales in 2016, it "identified roughly eleven factors that put

downward pressure on Gonzales' sentence." MOO, 163 F. Supp. 3d at 1129. The Court explained

that:

> First, although the Court has no Kimbrough [v. United States, 552 U.S. 85 (2007)]
> disagreement with the Guidelines advisory range, it does think that the following
> three sub-factors put downward pressure on the sentence: (i) the actual loss here is
> considerably below the intended loss; (ii) although there are more than fifty victims
> by operation of the Guidelines, only three governmental agencies are sustaining
> actual losses in this case; and (iii) although this criminal enterprise qualifies as
> sophisticated under the Guidelines, in reality, it was probably going to be
> discovered. Second, Gonzales' history and characteristics put downward pressure
> on the sentence -- he seems to be a good father and that he has a seven-year-old
> daughter puts downward pressure on the sentence. The Court should strive to not
> lock him up more than necessary because his daughter needs him, and studies
> within the state prison system in the southern part of the state show that fathers who
> stay in contact with their children while they are in custody have a lower recidivism
> rate. See R. Romo, Prison Program Will Expand, Father Helped in Southern
> Facility, Albuquerque Journal, at B3 (July 7, 2004)("When fathers who are
> incarcerated are connected to their children and their families, the inmates' chances
> of coming back [to prison] decrease."). Third, Gonzales was able to use
> rehabilitation in the past to gain skills, including a college education, and benefit

from it. Fourth, that the recommended Guidelines range in this case is higher than other people who have maybe done more harm in fraud or embezzlement cases and the need to promote respect for the law, put downward pressure on the sentence. Fifth, the need for the sentence to be not greater than necessary always puts downward pressure on the sentence. Sixth, Gonzales' mental and emotional health put downward pressure on the sentence; the Court can use conditions of supervised release -- rather than incarceration -- to address these problems. Seventh, his physical conditions, including alcohol and drug abuse put downward pressure on the sentence; again, the Court can use conditions of supervised release -- rather than incarceration -- to address these problems. Eighth, that Gonzales cooperated with law enforcement following his arrest; that he offered to debrief, and that he pled guilty before Archuleta -- which may have contributed to Archuleta pleading guilty -- puts downward pressure on the sentence. Ninth, Gonzales' post-arrest rehabilitative efforts put downward pressure on the sentence. Tenth, that there is a sentencing disparity with other defendants who have similar records puts downward pressure on the sentence.[19] Eleventh, supervised release can go a long way in serving as an alternative to longer imprisonment; it may be that the Court can substitute supervised release for incarceration, and use supervised release to deal with Gonzales' drug and alcohol problems.

MOO, 163 F. Supp. 3d at 1129-31. The Court further explained:

The evidence set forth on Gonzales' Sentencing Memorandum suggests that the defendants with loss levels similar to Gonzales are not receiving as high of sentences. See Sentencing Memorandum 19-20. At the hearing, Gonzales also asked the Court to consider the sentence that Manny Aragon received -- a sentence of 67 months. See Tr. at 28:17-30:3 (Court, Pori). In 2009, Aragon, a former president pro tem of the New Mexico Senate, received a sentence of 67-months imprisonment pursuant to a rule 11(c)(1)(c) plea agreement; he faced charges regarding a fraud conspiracy that related to overbilling the State of New Mexico for expenditures in which Aragon was to receive over $600,000.00. See United States v. Aragon, No. 07-0615, Plea Agreement ¶¶ 3, 7-8, at 2, 4-7, filed October 15, 2008 (D.N.M.)(Doc. 611)("Aragon Plea"); United States v. Aragon, No. 07-0615, Judgment in a Criminal Case at 2, filed April 29, 2009 (D.N.M.)(Doc. 824). Another co-defendant in that case, Raul Parra, admitted to taking "approximately $3.3 million in proceeds from . . . fraudulent overbillings," most of which Parra gave to his codefendants. United States v. Parra, No. 07-0615, Plea Agreement ¶ 7, at 4-6, filed October 14, 2008 (D.N.M.)(Doc. 610)("Parra Plea"). Parra agreed to a sentence that would not be greater than 71-months imprisonment and did not waive his appellate rights. See Parra Plea ¶¶ 8, 15, at 7, 12. He ultimately received a sentence of 46 months following a departure under U.S.S.G. § 5K1.1. See United States v. Parra, No. 07-0615, Clerk's Minutes at 2, filed March 17, 2009 (D.N.M.)(Doc. 782); United States v. Parra, No. 07-0615, Judgment in a Criminal

---

[19]This footnote is excerpted below.

Case at 2, filed April 30, 2009 (D.N.M.)(Doc. 825). Another co-defendant in that case, Toby Martinez -- a former administrator of the Bernalillo County Metropolitan Court -- stipulated to an amount of loss attributable to his conduct that was "more than $1,500,000.00 but not more than $2,500,000.00." United States v. Martinez, No. 07-0615, Plea Agreement ¶ 8, at 10, filed October 10, 2008 (D.N.M.)(Doc. 578). He ultimately received a sentence of 67 months. See No. 07-0615, Judgment in a Criminal Case at 2, filed May 5, 2009 (D.N.M.)(Doc. 827). The Court also considers the sentence that the Court gave Robert Vigil in 2007 -- a sentence of 37-months imprisonment. See United States v. Vigil, No. 05-2051, Judgment in a Criminal Case at 2, filed February 22, 2007 (D.N.M.)(Doc. 456)(Browning, J.). The charges against Vigil related to abuse of his position as the head of the New Mexico State Treasurer's Office, including charges of extortion. See United States v. Vigil, 476 F. Supp. 2d 1231, 1242 (D.N.M. 2007)(Browning, J.). After the jury in the first trial hung, the jury in the retrial, one of the most publicized trials in New Mexico history, acquitted Vigil on twenty-three counts and convicted him on one count. See United States v. Vigil, No. 05-2051, Verdict at 1-5, filed September 30, 2006 (D.N.M.)(Doc. 408)(Browning, J.). The jury convicted Vigil of attempt to extort property by wrongful use and threat of use of economic harm, and under color of official right, in violation of 18 U.S.C. § 1951(b)(2). See United States v. Vigil, 476 F. Supp. 2d at 1240. The Court calculated a guideline imprisonment range of "235 to 240 months." United States v. Vigil, 476 F. Supp. 2d at 1298. The relevant conduct under the guidelines included some of the conduct for which Vigil was acquitted, increasing dramatically his sentencing range. See United States v. Vigil, 476 F. Supp. 2d at 1290-97. While the jury did not find that some of the alleged criminal conduct occurred beyond a reasonable doubt, the Court found that some of the conduct occurred by a preponderance of the evidence. See United States v. Vigil, 476 F. Supp. 2d at 1290-97. See also United States v. Washington, 11 F.3d 1510, 1516 (10th Cir.1993)(recognizing "the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof" but concluding that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard"). The USPO recommended that the Court impose a downward variance for the following reasons, but did not specify a specific recommended sentence:

> In this case, when looking at the nature and circumstances of the offense and the history and characteristics of the defendant, the Court should consider several factors. Robert Vigil is currently 53 years old and this is his first contact with law enforcement or any Court. Additionally, the defendant has no history of violence. Mr. Vigil is a very educated person, and has maintained a stable employment history for his adult life.

United States v. Vigil, 476 F. Supp. 2d at 1244.

The Court ultimately sentenced Vigil to 37-months imprisonment. See United States v. Vigil, 476 F. Supp. 2d at 1324. In arriving at its sentence, the Court found it significant that: (i) the jury had acquitted Vigil on twenty-three counts; (ii) that Vigil had been acquitted of much of the relevant criminal conduct at issue; (iii) the length of a guideline sentence in light of his acquittal on twenty-three counts; (iv) the significant damage to Vigil's reputation and his high legal bills; (v) the relatively low need for specific deterrence to Vigil in light of his age; and (vi) the likelihood that his co-defendants would receive lighter sentences based on entering into plea agreements. United States v. Vigil, 476 F. Supp. 2d at 1306-24. Most importantly, however, the Court concluded that sentencing Vigil to 235 months, a sentencing length reflecting his relevant conduct under the guidelines, after he had been acquitted at trial on twenty-three counts would not promote respect for the law and would not result in a just sentence. See United States v. Vigil, 476 F. Supp. 2d at 1322 ("While the Court cannot say that this case falls outside the heartland of traditional extortion cases, the advisory guideline sentence in Vigil's case is too harsh and is greater than necessary to satisfy federal sentencing goals.").

MOO, 163 F. Supp. 3d at 1129-31.

The Court also examined "nine factors that put upward pressure on the sentence and suggest that the Court should remain in the Guidelines range." MOO, 163 F. Supp. 3d at 1131.

The Court explained:

> (i) this federal offense is very serious and involved the theft of enormous amounts of public money; (ii) the sentence must reflect the actual loss here and the seriousness of the offense; (iii) the sentence must promote respect for the law; (iv) Gonzales has a criminal history which involves burglary and rape; (v) the sentence must afford adequate deterrence -- both at the specific and general level; (vi) there is a need to protect the public from Gonzales; (vii) Gonzales rehabilitated during his last incarceration, but used that rehabilitation to then commit this federal offense; (viii) there is a need to avoid unwarranted sentencing disparities created by varying or varying too much; and (ix) the sentence must be sufficient to reflect the § 3553(a) factors.

MOO, 163 F. Supp. 3d at 1131-32.

The Court varied downward:

> On balance, the Court concludes that the factors that put downward pressure on the sentence slightly outweigh those that put upward pressure on the sentence to stay in the Guidelines range. In sum, the circumstances weigh in favor of varying below the Guidelines range by the equivalent of 2 levels, which produces a working

Guidelines range of 87 to 108 months. The Court sentences Gonzales to a term of incarceration of 87-months imprisonment for Counts 1-5, and 24 months for Count 6, to run consecutively for a total term of imprisonment of 111 months. The Court also imposes a term of three years of supervised release on Counts one through five, and a concurrent one-year term of supervised release on Count 6, for a total term of three years.

The Court has, as the record and this opinion demonstrate, carefully considered the Guidelines, but in arriving at its sentence, the Court has taken into account other sentencing goals. Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant. After carefully considering the case's facts and circumstances, the Court concludes that the punishment set forth in the advisory Guidelines range is not appropriate for these offenses. The Court then carefully considered the kinds of sentences and the ranges that the Guidelines establish and concludes that a variance the equivalent of a couple of offense levels is appropriate. It thus sentences at the bottom of that working range -- 87 months. The Court carefully considered Gonzales' proposed sentence -- 81 months -- at which the Court's Guideline range is about six months above that, the Court did not think the facts and circumstances justify pushing it to that low of a level as Gonzales suggests. The Court concludes that a sentence of 87 months is sufficient -- but also necessary -- to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence (both at the general and specific level), protect the public, avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and, because the Court will place Gonzales on supervised release, effectively provide him with some needed education, training, and care to avoid these problems from reoccurring in the future. In sum, the Court concludes that the 87-month sentence fully and effectively reflects each of the factors embodied in 18 U.S.C. § 3553(a). While the Court's task, as a District Court and a sentencing court, is not to come up with a reasonable sentence, but to arrive at a sentence that accurately reflects the factors in 18 U.S.C. § 3553(a), see United States v. Martinez-Barragan, 545 F.3d 894, 904-05 (10th Cir. 2008), the Court also believes the sentence is reasonable. Finally, but perhaps most importantly, the Court concludes that the 87-month sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in the Sentencing Reform Act.

MOO, 163 F. Supp. 3d at 1133. Accordingly, the Court concludes that it crafted carefully Gonzales' sentence in 2016 and applied properly the § 3553(a) factors.[20]

---

[20]The circumstances in Gonzales' case are not particularly unique, because the Court carefully varied from the Guidelines range instead of sentencing in the advisory Guidelines range -- in general, it does not make sense to work hard to arrive at a sentence that accurately reflects the

## B. GONZALES HAS NOT SHOWN BY A PREPONDERANCE OF THE EVIDENCE THAT THE SECTION 3553(A) FACTORS, WHICH SUPPORTED 111 MONTHS' INCARCERATION, NOW SUPPORT A TIME SERVED SENTENCE.

"[T]he Supreme Court has determined that courts may consider post-sentencing conduct in assessing the § 3553(a) factors when considering whether to adjust a previously imposed sentence." United States v. Allen, 956 F.3d 355, 358 (6th Cir. 2020)(citing Pepper v. United States, 562 U.S. 476, 487-93 (2011)). The Court, therefore, will apply the § 3553(a) factors to Gonzales' pre-sentencing conduct as well as his conduct after the Court imposed his sentence in 2016. The Court concludes that none of the § 3553(a) factors support Gonzales' release from prison.[21]

---

3553(a) factors only to discard it several years later. To the Court's dismay, on May 27, 2021, the Senate Judiciary Committee, by a fourteen to eight vote, passed the COVID-19 Safer Detention Act, which would further expand defendants' ability to bring compassionate release actions directly in federal court. See S. 312, 117th Cong (2021). The Court works very hard to get its sentences right and to reflect accurately the § 3553(a) factors. It does not seem to make sense to have a second sentencing unless there was some procedural or substantive error. In a big district like New Mexico -- which received 2,977 new criminal case filings, the fifth highest of any district in the nation, in 2020, and currently has only five active District Judges, one about to take senior status, and three Senior District Judges -- resentencing can impose a real burden. See Department of Justice, United States Attorneys' Annual Statistical Report: Fiscal Year 2020 at 4, tbl.1, Office of the United States Attorneys (last updated April 29, 2021), https://www.justice.gov/usao/resources/annual-statistical-reports. See also Solem v. Stumes, 465 U.S. 638, 654 (1984)(Powell, J., concurring)("Retroactive application of constitutional rules frustrates the state's enforcement of its criminal law despite the state's careful adherence to the federal constitutional standards that governed at the time of the prisoner's conviction."). The retroactivity and resentencing conundrum in which district judges find themselves often treats criminal defendants as a class rather than considering the factors in each case, turning United States v. Booker on its head. See, e.g., Response at 11 ("It is the currently the position of the Department of Justice that, during the COVID-19 pandemic, an inmate who presents one of the medical conditions identified by the CDC as risk factors placing individuals at higher risk of severe outcomes from COVID-19 . . . presents . . . extraordinary and compelling" circumstances). This wholesale resentencing of America's federal prison population, without much guidance, in the midst of rising crime rates in many major American cities, including Albuquerque, calls for some rethinking where Congress is wanting as a bottom line.

[21]Although Gonzales provided the Court with eight supplements, the Motion, the Reply, and the Brief, Gonzales devotes very little time to discussing § 3553(a)'s factors. See e.g., Brief

First, "the nature and circumstances of the offense and the history and characteristics of "

Gonzales counsel against a sentence of time served. 18 U.S.C. § 3553(a)(1). Gonzales was

involved in a scheme to us fraudulently approximately 107 victim identities, and was connected to

twenty fictitious companies -- eleven in New Mexico, seven in Colorado, and two in Texas – which

resulted in a total loss of $804,735.73. See PSR ¶ 7, at 5. This type of fraud remains a major

problem in the United States -- during the COVID-19 pandemic, billions in unemployment relief

funds were stolen by persons who fraudulently applied for pandemic-related unemployment

benefits. See, e.g., Scott Zamost, Secret Service Seizes $2 Billion in Fraudulent Covid

Unemployment Payments, Returns Funds to States, CNBC (May 21, 2021),

https://www.cnbc.com/2021/05/12/secret-service-seizes-2-billion-in-fraudulent-unemployment-

payments-returns-funds-to-states.html. Moreover, although Gonzales emphasizes that this offense

was nonviolent, Gonzales has a criminal history involving rape and burglary. See MOO, 163

F. Supp. at 1082 (quoting PSR ¶ 81, at 22). True, as Gonzales notes, he has made significant

rehabilitative efforts in prison. See Reply at 3 (noting that Gonzales "has engaged in extensive

rehabilitative and vocational programming" while incarcerated). Gonzales has also served over

---

at 1 (discussing only § 3553(a)(2)(D), but ignoring the other § 3553(a) factors). In the section of Gonzales' Motion entitled "the Section 3553(a) factors support compassionate release," Gonzales primarily summarizes the dangers of COVID-19, rather than discussing and applying the individual § 3553(a) factors to Gonzales' case. See Motion at 15-28. In the Reply, Gonzales addresses some, but not all, of the § 3553(a) factors individually, but does not engage with the Court's analysis in Gonzales' original sentencing MOO. Similarly, the United States, in its Response, recites the Court's analysis in its MOO, but, although it acknowledges that "the history and characteristics of the defendant . . . have changed since the sentence was originally imposed," it does not explain how Gonzales has changed and how the Court should weigh this change. Response at 19. The United States only urges the Court to "find that the defendant has not provided sufficient information to show that the § 3553(a) factors which previously supported a term of incarceration of 111 months now support a sentence of essentially one half that term." Response at 19.

four years in the BOP without any disciplinary write-ups. See Motion at 28; Reply at 3. Although the Court is glad to see that Gonzales has been compliant with BOP directives, this does not demonstrate that he will not reoffend, particularly given that his underlying offense -- which concerns greatly the Court -- would be relatively difficult to commit while incarcerated. Further, Gonzales "rehabilitated" previously, "but used that rehabilitation to then commit this federal offense," -- Gonzales obtained a college education and learned financial skills, but used those skills to commit financial crimes. MOO, 163 F. Supp. 3d at 1131-32. In sum, the severity of Gonzales' offense, coupled with his significant criminal history, counsel against imposing a time served sentence in Gonzales' case. See 18 U.S.C. § 3553(a)(1).

The factors that § 3553(a)(2) describes also weigh against Gonzales' release. Because the Court is concerned that Gonzales may reoffend, it has a duty to protect the public from his future crimes. See § 3553(a)(1). To achieve the Court's goal of preventing recidivism, it is important that Gonzales serve the entirety of his sentence, which the Court carefully crafted. It is also imperative that the Court deter others in New Mexico from committing this offense; from April 2020 to April 2021, unemployment fraud schemes in New Mexico resulted in $133,000,000.00 in losses, and "since 2018, New Mexico's rates of improper payments and fraud have more than doubled." See LFC Report at 10. Moreover, while the Court cannot and will not use incarceration for rehabilitative purposes, see 18 U.S.C. § 3582(a)("The court, in determining whether to impose a term of imprisonment . . . in determining the length of the term, shall consider the factors set forth in section 3553(a) . . . , recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."); United States v. Story, 635 F.3d 1241, 1245-47 (10th Cir. 2011)(holding that "sentencing courts may not increase the term of incarceration to advance rehabilitative goals" because "increasing incarceration to promote rehabilitative goals is not

permitted under § 3582(a)"); the Court observes Gonzales could benefit from further BOP programming to assist him with his gambling addiction and prescription pill addiction, which have been a continuing problem in his life and which motivated the underlying offense, see MOO, 163 F. Supp. 3d at 1124 ("Unfortunately, the nation's prisons and criminal justice system contain many who have some addiction, mostly drugs and alcohol. Even gambling addiction is just a reason for a need for money, and almost everyone in the criminal justice system needs money."). Accordingly, the factors that § 3553(a)(2) describes weigh against Gonzales' release, because if the Court reduced Gonzales' sentence to time served, it would be insufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, or provide Gonzales with necessary training and care.

Both "the kinds of sentences available," and "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission . . . subject to any amendments made to such guidelines," do not support a reduction in Gonzales' sentence, because the Court already varied downward from the Guidelines sentence to which Gonzales was subject. Specifically, the Court granted "a variance the equivalent of a couple of offense levels" and then "sentence[d] at the bottom of that working range." MOO, 163 F. Supp. 3d at 1132. Gonzales' initial Guideline imprisonment range was 132 to 159 months, and the Court sentenced him to 111 months. Accordingly, because Gonzales already received a sentence which could have been much higher, § 3553(a)(3)-(4) do not support any reduction on Gonzales' sentence. See MOO, 163 F. Supp. 3d at 1132. Moreover, the Court sees no Sentencing Commission policy statements, and Gonzales presents none, that apply to this case. See Motion at 1-37; Brief at 1-18. Section 3553(a)(5), therefore, is a neutral factor in this case.

"[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" also counsels against Gonzales' release. 18 U.S.C. § 3553(a)(6). Gonzales already received a sentence below the Guideline imprisonment range the PSR calculates. See PSR at 35 (no paragraph numbering). True, as Gonzales notes, Gonzales' co-Defendant, Archuleta, received a 71-month sentence -- a lower sentence than Gonzales'. See United States v. Archuleta, No. CR 14-0922 JB, 2017 WL 2297129, at *26 (D.N.M. Apr. 24, 2017)(Browning, J.) Archuleta was convicted of the same crimes as Gonzales, except that Gonzales was also convicted of aggravated identity theft, which carries a mandatory prison term of "2 years imprisonment to run consecutively to any other term of imprisonment." PSR at 2 (no paragraph numbering). Subtracting two years from Gonzales' sentence as imposed results in an 87-month sentence, which is still higher than Archuleta's. Archuleta, however, had a lower offense level than Gonzales, and, as a result, had a lower Guideline range than Gonzales -- 97 to 121 months imprisonment. See United States v. Archuleta, , 2017 WL 2297129, at *26. Consequently, in Archuleta's case, the Court varied downward 26 months, and in Gonzales' case, the Court varied downward 21 months. The Court, however, concluded previously that Archuleta was less culpable in the scheme than Gonzales, and considered this in calculating Archuleta's downward variance . See United States v. Archuleta, 2017 WL 2297129, at *26. Moreover, if the Court gave Gonzales a time served sentence, Gonzales would serve less time than Archuleta, although Gonzales had a higher Guidelines range than Archuleta, committed an additional crime, and was more culpable in the conspiracy than Archuleta. See United States v. Archuleta, 2017 WL 2297129, at *26. Section 3553(a)(6) therefore weighs against reducing Gonzales' sentence, because any further sentencing reduction would create a significant disparity between Gonzales and other defendants sentenced for similar crimes.

Regarding § 3553(a)(7), Gonzales argues that it would be easier for him to pay restitution "if he was not earning the 25 cents an hour that he's earning in the BOP." Tr. at 31:1-3 (Converse). The Court ordered previously Gonzales to pay restitution of $804,735.73 to the victims of his crimes. <u>See</u> MOO, 163 F. Supp. 3d at 1087. The Court sees no evidence, however, and Gonzales does not argue, that he has attempted to pay any restitution while incarcerated. <u>See</u> Brief at 1-17. The Court understands that, given Gonzales' low wages in prison, it would be unlikely that he could pay a significant portion of the ordered restitution while incarcerated. <u>See</u> Reply at 14 ("[W]hile still in the BOP, Mr. Gonzales can make only min[i]mal progress on his restitution obligation."); Tr. at 31:1-6 (Converse)(stating that Gonzales is "earning . . . 25 cents an hour . . . in the BOP"). Nonetheless, the fact that Gonzales has made no progress in paying restitution does not demonstrate that he has taken the Court's restitution order seriously. Accordingly, § 3553(a)(7) does not weigh in Gonzales' favor.

Although the Court will not reduce Gonzales' sentence, the Court is concerned with the quality of medical care Gonzales has received from the BOP. Gonzales committed a serious offense, but he should receive adequate healthcare to address his medical conditions while in the BOP's care. Accordingly, the Court recommends and requests that the United States file a written report with the Court on July 1, 2021, informing the Court whether the BOP is providing Gonzales with appropriate medical care.

**IT IS ORDERED** that the Defendant Jasonn Gonzales' Motion for Compassionate Release Pursuant to Section 603(B)(1) of the First Step Act, filed May 18, 2020 (Doc. 136), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred A. Federici
   Acting United States Attorney
Jonathon M. Gerson
Stephen R. Kotz
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Kari Converse
   Assistant Federal Public Defender
Federal Public Defender
Albuquerque, New Mexico

       *Attorney for the Defendant*